**Emma TAYLOR, et al.,
Plaintiffs–Appellants,**

v.

**GENERAL MOTORS CORPORATION,
et al., Defendants–Appellees.**

No. 87–5829.

United States Court of Appeals,
Eleventh Circuit.

June 14, 1989.

Terry S. Nelson, Miami, Fla., for plaintiffs-appellants.

Ronald M. Owen, Orlando, Fla., Harold Lee Schwab, New York City, for American Honda & Honda Motor.

R. Benjamine Reid, Miami, Fla., David M. Heilbron, San Francisco, Cal., for Gen. Motors.

Before TJOFLAT, FAY and EDMONDSON, Circuit Judges.

TJOFLAT, Circuit Judge:

Charles Taylor and Paula Evans were killed in separate front-end automobile collisions while driving automobiles manufactured by General Motors Corporation and American Honda Motor Co.[1] The personal representatives of their respective estates brought this diversity action[2] against the automobile manufacturers, seeking damages under Florida tort law for the manufacturers' failure to equip the vehicles with airbags.[3] The manufacturers moved for dismissal on the ground that the plaintiffs' complaint[4] failed to state a cause of action

---

**1.** Taylor was driving a 1980 General Motors Chevrolet; Evans was driving a 1977 Honda Accord.

**2.** See 28 U.S.C. § 1332 (1982).

**3.** An airbag is an inflatable fabric cushion which remains concealed within the dashboard and steering column of an automobile until activated by the impact of a collision, when it rapidly inflates to cushion vehicle occupants from the forces of the collision. After the crash, the airbag quickly deflates to permit steering control or emergency egress.

**4.** As indicated in the text, this case consists of two separate personal injury actions. The district court allowed the actions to be brought in a single complaint because the complaint contained a count which alleged that the manufacturers were jointly liable to each plaintiff under a theory of "enterprise liability," for conspiring with one another to prevent the installation of airbags in their automobiles. The district court subsequently dismissed this count for failure to state a claim for relief, and its ruling is not challenged in this appeal.

The complaint before us is the fifth amended complaint appellants have filed in this case.

under Florida law, or, alternatively, on the ground that their claims were preempted by the National Traffic and Motor Vehicle Safety Act of 1966, Pub.L. No. 89–563, 80 Stat. 718 (codified as amended at 15 U.S.C. §§ 1381–1431 (1982 & Supp. V 1987)) [hereinafter the Safety Act], and Federal Motor Vehicle Safety Standard 208, 49 C.F.R. § 571.208 (1980), promulgated under the Safety Act. The district court granted the motion without reaching the preemption issue. The plaintiffs now appeal. We affirm.

## I.

We begin our review by determining whether appellants' complaint states claims cognizable under Florida law. Because no Florida appellate court has decided whether an automobile manufacturer can be liable for injuries sustained because it failed to equip an automobile with an airbag,[5] we must anticipate what the Supreme Court of Florida would do if presented with appellants' claims. *See, e.g., Nobs Chem., U.S.A., Inc. v. Koppers Co.*, 616 F.2d 212, 214 (5th Cir.1980).[6]

Appellants seek to recover from the appellee manufacturers under two theories of tort liability: strict liability and negligence. We examine these theories in order.

The original complaint was brought by Jodie Ziemba, who had been injured in a front-end collision while driving a Ford automobile. She sued Ford Motor Company, General Motors Corporation, and Chrysler Corporation to recover damages on behalf of herself and others injured in front-end automobile collisions. The first and second amended complaints added two new plaintiffs as well as additional defendants, including most of the automobile manufacturers selling cars in the United States. Upon motion by the defendants, the district court dismissed the second amended complaint and allowed plaintiffs thirty days leave to amend. The plaintiffs subsequently filed third and fourth amended complaints, both of which simply added more plaintiffs. Finally, in order to make the pleadings uniform, the plaintiffs voluntarily dismissed their third and fourth amended complaints and filed a fifth amended complaint. The district court thereafter granted defendants' joint motion to dismiss that complaint with prejudice. All of the plaintiffs who were still in the case then appealed. Thereafter, all except the two appellants presently before us dismissed their appeals. These two appellants

## A.

The Supreme Court of Florida has held that automobile manufacturers are answerable for damages in strict liability for design defects in their cars which, although playing no part in causing a primary automobile collision, nevertheless increase or bring about injury to occupants through secondary impacts against the interior of their cars during a collision. *See Ford Motor Co. v. Hill*, 404 So.2d 1049, 1050–51 (Fla.1981). The court has recognized two theories of strict liability for such design defects. *See generally In re Standard Jury Instructions (Civil Cases)*, 435 So.2d 782 (Fla.1983).

Under the first theory, an injured occupant may recover against the manufacturer if he demonstrates that, because of the automobile's design, it "fails to perform as safely as an ordinary consumer would expect." *Id.* at 783 n.* (quoting Report of the Committee on Standard Jury Instructions (Civil) of The Florida Bar). The automobiles in the instant case were equipped with seat belts, which were designed to prevent or minimize injuries to the driver caused by being propelled against the steering wheel, dash board, and windshield during a front-end collision. The appel-

now challenge the district court's rulings relating to their individual personal injury claims; they do not challenge the district court's refusal to certify this case as a class action.

5. Florida's trial courts have come down on both sides of the issue. *Compare Martinez v. Ford Motor Co.*, No. 87–893 CW (Fla.Cir.Ct., Broward County, Aug. 15, 1988) (granting automobile manufacturer's motion for summary judgment); *Phillips v. Namie*, No. 85–33951–CA–7 (Fla.Cir. Ct., Dade County, Sept. 22, 1986) (same); *Ziemba v. Zirkle*, No. 84–10484–DB (Fla.Cir.Ct., Broward County, Jan. 7, 1986) (dismissing complaint) *with Lynch v. Mims*, No. GCG–85–0019 (Fla.Cir.Ct., Polk County, Aug. 20, 1985) (denying motion to dismiss); *Barfels v. Holman Imports, Inc.*, No. 85–1901–CB (Fla.Cir.Ct., Broward County, Sept. 1985) (same).

6. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

lants' decedents suffered their fatal injuries when they were thrown forward against such objects. Appellants, however, have not alleged in their complaint that their decedents' seat belts failed to function as intended, or that the injuries their decedents sustained were beyond those "an ordinary consumer" (wearing seat belts) would have expected; we therefore conclude that appellants seek no recovery under this first theory of strict liability.[7]

To recover under Florida's second theory of strict liability, an injured occupant of an automobile must show (1) that the injury he sustained as a result of the challenged automotive design would have been avoided, or less severe, had the manufacturer used an existing alternative design, and (2) that the enhanced danger posed by the challenged design outweighs the added cost, if any, to the manufacturer of the alternative design.[8] *See Cassisi v. Maytag Co.*, 396 So.2d 1140, 1145–46 (Fla.Dist.Ct.App.1981), *cited with approval in In Re Standard Jury Instruction (Civil Cases)*, 435 So.2d at 783 n.\*. Appellants are proceeding under this second theory. In their complaint, they allege that their decedents would not have been so severely injured had the manufacturers equipped their cars with airbags as well as seat belts, that the manufacturers had the technology to make and install airbags, and that they could have equipped the decedents' automobiles with airbags at

a reasonable cost. These allegations, if proven, would appear to make out a case of strict liability.

The district court, however, rejected appellants' strict liability claims because it believed that they could not prove their allegation that an automobile equipped with airbags and seat belts would protect a driver in a front-end collision better than an automobile equipped only with seat belts. In the court's words: "[S]eat belts and airbags are equally efficacious if seat belts are used." In its dispositive order, the court announced that it was granting the manufacturers' motion to dismiss appellants' claims because appellants failed to state a cause of action; actually, the court granted summary judgment for the manufacturers.

The only basis in the record for the district court's factual finding that seat belts alone are as effective as airbags is the following statement made by the Secretary of Transportation:

Based on field experience through December 31, 1983, ... the computed airbag and manual belt effectiveness (as used in the equivalent cars) for fatalities is now the same. This means that airbags would not save any more lives than the belt systems as used in those cars.

49 Fed.Reg. 28,962, 28,985 (1984).[9] This statement, which is contained in the Secre-

---

**7.** The manufacturers, however, in their briefs on appeal, assume that appellants seek damages under such theory and cite the following cases which, they contend, suggest that appellants' allegations fail to state a claim for relief. *See Higgs v. General Motors Corp.*, 655 F.Supp 22, 26 (E.D.Tenn.1985) (holding that consumer expectation test precludes a cause of action for failure to equip automobiles with airbags because, as a matter of law, the ordinary consumer would "not expect airbags to pop out of the dash"), *aff'd without opinion*, 815 F.2d 80 (6th Cir. 1987); *see also Hughes v. Ford Motor Co.*, 677 F.Supp. 76, 78 (D.Conn.1987) (same); *Vanover v. Ford Motor Co.*, 632 F.Supp. 1095, 1098 (E.D. Mo.1986) (same). These cases are inapposite. They do not answer the question the manufacturers assume the appellants' allegations pose; that is, whether the driver of an automobile injured in a front-end collision states a claim for relief against the automobile's manufacturer if the driver alleges that the injuries he received were more serious than the injuries an ordinary

consumer could have expected to receive under the circumstances.

**8.** A number of other jurisdictions have similarly recognized this second theory of strict liability. *See, e.g., Mitchell v. Fruehauf Corp.*, 568 F.2d 1139, 1143–44 (5th Cir.1978) (applying Texas law); *Raney v. Honeywell, Inc.*, 540 F.2d 932, 935 (8th Cir.1976) (applying Iowa law); *Barker v. Lull Eng'g Co.*, 20 Cal.3d 413, 432, 573 P.2d 443, 455–56, 143 Cal.Rptr. 225, 237–38 (1978); *Johnson v. Clark Equipment Co.*, 274 Or. 403, 547 P.2d 132, 136 (1976).

**9.** The manufacturers urged the district court to find on two grounds that, as a matter of law, seat belts alone are as effective as airbags. The first ground was that appellants had admitted such in the brief they had filed in response to the manufacturers' motion to dismiss their fifth amended complaint. In that brief, appellants stated: "The National Highway Traffic Safety Administration estimates that with a [mandato-

tary's commentary on the Department of Transportation's 1984 amendments to the automobile safety standard relating to occupant crash protection, appeared in a brief filed by one of the manufacturers, Volkswagen of America, Inc., in support of the defendants' motion to dismiss appellants' complaint.[10]

We assume that the district court made its finding that "seat belts and airbags are equally efficacious" by taking judicial notice, pursuant to Fed.R.Evid. 201, of the Secretary's statement, as cited in Volkswagen's brief. For purposes of discussion, we further assume that the factual recitation in the statement, "[b]ased on field experience through December 31, 1983, ... the computed airbag and manual belt effectiveness ... is now the same," is not subject to dispute. *See United States v. Pabian,* 704 F.2d 1533, 1538 (11th Cir.1983) (Fed.R.Evid. 201(b) "requires that a judicially noticed fact be one 'not subject to reasonable dispute' in that it is 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned' or is generally known."). Were this all that the Secretary had to say on the subject, one could argue that we should uphold the district court's finding.[11] We do not uphold the finding, however, because the Secretary had much more to say about the relative effectiveness of airbags and seat belts.

When the statement quoted in Volkswagen's brief is read in full context (with statements that were not quoted in the brief), it appears that seat belts may not be as effective as airbags. The Secretary stated as follows:

> *Because of limited field experience with airbags, estimating the effectiveness of these devices is very difficult. There are so few cars equipped with airbags and so few cases of serious or fatal injuries that the field experience has no statistical meaning.* Based on field experience through December 31, 1983, ... the computed airbag and manual belt effectiveness (as used in the equivalent cars) for fatalities is now the same. This means that airbags would not save any more lives than the belt systems as used in those cars. *But because the data base is so small, we cannot place any confidence in this effectiveness figure.*

49 Fed.Reg. at 28,985 (emphasis added). At another point in her commentary, the Secretary stated that Allstate Insurance Company's statistics comparing the effectiveness of airbags and seat belts in crash tests revealed that "airbags are more effective than belts in protecting against head and facial injuries." *Id.* at 28,967. Then, in concluding her commentary, the Secretary had this to say:

---

ry] seat belt or a passive restraint system, such as an airbag, 10,000 lives would be saved on a yearly basis." Having examined this statement within its context in the brief, we conclude that the statement is not an admission that seat belts and airbags are, in effect, the same; hence, the district court could not properly have drawn upon it to make its finding. Rather, we believe that the court relied upon the manufacturers' second ground, which was the statement of the Secretary of Transportation quoted in the text.

**10.** Volkswagen filed the brief in support of the manufacturers' motion to dismiss appellants' fifth amended complaint. *See supra* note 4. Appellee American Honda Motor Co., in urging us to accept as undisputed the district court's finding that seat belts are as effective as airbags, cites the same portion of the Secretary's statement that Volkswagen quoted in its brief to the court below.

**11.** Even if this is all the Secretary had to say on the subject of the relative effectiveness of airbags and seat belts, and we were to conclude

that the effectiveness figure is reliable, there are two reasons why the Secretary's statement would nonetheless fail to support the district court's finding that airbags and seat belts are equally effective in front-end collisions. First, the statement refers to field experience concerning all types of collisions rather than isolating field experience concerning front-end collisions —the type that killed appellants' decedents. Because airbags are effective only in frontal and near-frontal collisions and offer little or no protection in side-impacts, back-end collisions, or roll-overs, *see* 49 Fed.Reg. at 28,991, the cited field experience figures are not relevant for our purposes. Second, the field experience did not compare the effectiveness of airbags used in combination with seat belts and seat belts alone. Only such a comparison is relevant here because the complaint alleges that the manufacturers should be held liable for failing to *add* airbags to the decedents' automobiles which were already equipped with seat belts.

[Airbags and seat belts in combination] provide more protection at higher speeds than safety belts do [alone], and they will provide better protection against several kinds of extremely debilitating injuries (e.g., brain and facial injuries) than safety belts. They also generally spread the impact of a crash better than seatbelts, which are more likely to cause internal injuries or broken bones in the areas of the body where they restrain occupants in severe crashes.

*Id.* at 28,991. When we consider these additional observations concerning the efficacy of seat belts *vis-a-vis* airbags (or airbags used in combination with seat belts), we conclude that the district court erred in finding that, as a matter of law, seat belts are as effective as airbags and that appellants could not establish a case of strict liability under Florida law.

### B.

We turn next to appellants' negligence claims. The Supreme Court of Florida has held that an automobile manufacturer has a duty to use reasonable care in the design of its vehicle to avoid subjecting the user to an unreasonable risk of injury in the event of collision. *See Ford Motor Co. v. Evancho*, 327 So.2d 201, 204 (Fla.1976). In the context of the case before us, the question is whether the manufacturers had a duty to protect appellants' decedents from any of the injuries they sustained in their front-end collisions by equipping the decedents' automobiles with airbags in addition to seat belts. The district court answered this question in the negative.

In rejecting appellants' negligence claims, the district court, citing *Evancho*, stated that "Plaintiffs' argument amounts to imposition of a duty to 'foolproof' a vehicle." We disagree. Although the court in *Evancho* observed that "manufacturers are not insurers and are under no duty to design a crashworthy, accident-proof, or foolproof vehicle," *id.* at 204, it

recognized that the manufacturer is nonetheless required to take reasonable steps, within the limits of cost and technology, to design and produce an automobile that "minimize[s] or lessen[s] the injurious effects of a collision." *Id.* (quoting *Larsen v. General Motors Corp.*, 391 F.2d 495, 503 (8th Cir.1968)). Appellants' complaint alleges that at the time the manufacturers designed and constructed the decedents' automobiles, the manufacturers knew that airbags were a technologically feasible and cost effective safety device that would probably lessen the potential for severe injury in a front-end collision. Requiring a manufacturer to add a known safety device, which is both technologically and economically feasible, is quite obviously not the same thing as requiring the manufacturer to build a "foolproof" vehicle. We therefore conclude that the allegations of appellants' complaint were sufficient to state a claim of negligence under Florida law.

In so concluding, we note that, contrary to the manufacturers' assertion, we are not the first federal circuit court to hold that a common law cause of action exists against an automobile manufacturer for failing to equip a vehicle with a form of passive restraints. In *Fox v. Ford Motor Co.*, 575 F.2d 774 (10th Cir.1978), the Tenth Circuit found that Wyoming would recognize a cause of action in negligence against an automobile manufacturer for failing to cushion the backs of a vehicle's front seats in anticipation of a collision, which might cause the passengers to strike their heads against the backs of the seats. Such cushions, of course, constitute passive restraints, similar in effect to the airbag. *See* 49 Fed.Reg. at 28,965, 28,995 (discussing the proposed development of "passive interiors"). We accordingly hold that the district court erred in ruling that appellants failed to state a claim cognizable under Florida law.[12]

---

12. Our holding is not inconsistent with that rendered by this court in *Evers v. General Motors Corp.*, 770 F.2d 984 (11th Cir.1985). In *Evers*, the plaintiff was involved in a side-impact collision and sought damages under Florida tort law

against the manufacturer of his automobile for its failure to equip the vehicle with airbags. We upheld the district court's grant of summary judgment for the manufacturer because there was no suggestion that airbags would have pre-

## II.

Having found that the failure to provide airbags can serve as a basis for tort liability under Florida law, we must now decide whether such liability is preempted by federal law.[13] The supremacy clause of the United States Constitution requires that all conflicts between federal and state law be resolved in favor of the federal rule. *See* U.S. Const. art. VI, cl. 2. The supremacy clause therefore prohibits the enforcement of any state law that conflicts with the exercise of federal power. *See, e.g., Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 152–53, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982).

Federal law may preempt state law in three ways. First, Congress, in drafting a statute, may use language that dictates the extent to which the statute preempts state law. Second, despite the absence of such language, the wording of the statute or its legislative history may evince Congress' intent to occupy a given regulatory field to the exclusion of state law. Third, even when Congress has not occupied the entire regulatory field, federal law nevertheless may implicitly preempt state law to the extent that state law conflicts with a federal regulatory scheme. *See Michigan Canners & Freezers Ass'n v. Agricultural Mktg. & Bargaining Bd.,* 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984); *see also International Paper Co. v. Ouellette,* 479 U.S. 481, 494, 107 S.Ct. 805, 813, 93 L.Ed.2d 883 (1987).

The manufacturers contend that appellants' claims are foreclosed under the first type of preemption: according to the manufacturers, the language of the Safety Act expressly preempts appellants' tort claims. Alternatively, the manufacturers argue that the third type of preemption bars appellants' claims, contending that allowing appellants to prosecute their claims would frustrate the Safety Act's regulatory scheme.[14]

### A.

Before addressing the manufacturers' two preemption arguments, it is helpful first to describe briefly the history of the Safety Act and the relevant Federal Motor Vehicle Safety Standards promulgated under that Act. The Safety Act was passed by Congress in 1966 in response to the "soaring rate of death and debilitation on the Nation's highways." *See* S.Rep. No. 1301, 89th Cong., 2d Sess. 1, *reprinted in* 1966 U.S.Code Cong. & Admin.News 2709, 2709. Through the Safety Act, Congress sought to increase automotive safety by authorizing the promulgation of safety standards. *See* 15 U.S.C. §§ 1391(2), 1392(a) (1982). The responsibility for promulgating these standards was given first to the Department of Transportation and later to the National Highway Transportation Safety Administration (NHTSA). *See* Highway Safety Act of 1970, Pub.L. No. 91–605, § 202(a), 84 Stat. 1713, 1739 (codified at 49 U.S.C. § 105 (1982)).

---

vented injury in a side-impact collision. *Id.* at 986–87.

**13.** We note that the question of whether the Safety Act and Safety Standard 208 preempt common law claims for failure to provide airbags has produced a substantial divergence of opinion among the courts that have faced the question. Cases holding that the Safety Act and Safety Standards do not preempt state common law suits for failure to provide airbags include *Richart v. Ford Motor Co.,* 681 F.Supp. 1462 (D.N.M.1988); *Garrett v. Ford Motor Co.,* 684 F.Supp. 407 (D.Md.1987); and *Wood v. General Motors Corp.,* 673 F.Supp. 1108 (D.Mass.1987), *rev'd* 865 F.2d 395 (1st Cir.1988). For cases holding that failure to provide airbags claims are preempted, see, e.g., *Staggs v. Chrysler Corp.,* 678 F.Supp. 270 (N.D.Ga.1987) (implied preemp-

tion); *Schick v. Chrysler Corp.,* 675 F.Supp. 1183 (D.S.D.1987) (same); *Baird v. General Motors Corp.,* 654 F.Supp. 28 (N.D.Ohio 1986) (same) *Cox v. Baltimore County,* 646 F.Supp. 761 (D.Md.1986) (express preemption); *Vanover v. Ford Motor Co.,* 632 F.Supp. 1095 (E.D.Mo.1986) (same). The only federal appellate court that has addressed this issue, the United States Court of Appeals for the First Circuit, held in a divided decision that the federal law impliedly preempts a state common law suit for failure to provide airbags. *See Wood v. General Motors Corp,* 865 F.2d 395 (1st Cir.1988).

**14.** The manufacturers concede that Congress did not intend to occupy the entire field of automotive safety; therefore, the second type of preemption is not applicable to this case.

The safety standard here at issue, Standard 208, was first adopted in 1967. This standard initially required the installation of manual lap belts in all new automobiles. *See* 32 Fed.Reg. 2415 (1967). In 1972, NHTSA amended Standard 208 to require a gradual phase-in of passive restraints (i.e., airbags, padded interiors, or automatic seat belts) in all cars. For models made before August 1975, manufacturers were permitted to use manual belts with an ignition interlock system, which prevented a car from starting until the seat belts were fastened. *See* 37 Fed.Reg. 3911–12 (1972). Public outcry against this ignition interlock system prompted Congress in 1974 to amend the Safety Act. The amendment required NHTSA to rescind the ignition interlock standard. It also authorized NHTSA to adopt a standard that *permitted* manufacturers to install either passive restraint systems or manual belt systems; the amendment, however, prohibited NHTSA from issuing any standard that *required* manufacturers to install passive restraints, unless such a standard had been submitted first to both houses of Congress and not disapproved by them. *See* Motor Vehicle and Schoolbus Safety Amendments of 1974, Pub.L. No. 93–492, § 109, 88 Stat. 1470, 1482 (codified at 15 U.S.C. § 1410b(b), (c) (1982)).

Consequently, NHTSA amended Standard 208 to delete the ignition interlock requirement. *See* 39 Fed.Reg. 38,380 (1974). As amended, Standard 208 granted manufacturers the option to install one of three restraint systems: passive restraints for front and lateral crashes; passive restraints for front crashes plus lap belts for side crashes and rollovers; or manual seat belts alone. *Id.* This is the version of Standard 208 that was in effect at the time the automobiles in this case were designed and manufactured. *See* 49 C.F.R. § 571.208 (1977) & (1980).[15] Appellants do not argue that these automobiles did not comply with the version of the safety standard in effect at the time of their manufac-

ture. Rather, they allege, in effect, that the automobiles were defectively designed because the manufacturers chose the safety standard's seat belt option rather than its combination seat belt and passive restraint option.

### B.

We turn now to the manufacturers' first preemption argument—that the Safety Act "on its face" expressly preempts state common law liability based on the failure to provide airbags. We begin our analysis of this issue by recognizing that a strong presumption exists against finding express preemption when the subject matter, such as the provision of tort remedies to compensate for personal injuries, is one that has traditionally been regarded as properly within the scope of the states' rights. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947) ("[W]e start with the assumption that the historic police powers of the States [are] not to be superseded by [a] Federal Act unless that [is] the clear and manifest purpose of Congress."); *see also Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–44, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963) (no preemption of state law regulating maturity of marketed avocados unless "Congress has unmistakably so ordained"). The task before us, then, is to determine whether the language of the Safety Act "unmistakably" manifests an intent to preempt appellants' common law claims.

In making their express preemption argument, the manufacturers rely principally upon the Safety Act's "preemption" clause, which provides in part that:

Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor

**15.** Safety Standard 208 has been amended once again by NHTSA. The version of the Standard presently in effect requires manufacturers to equip all automobiles manufactured after Sep-

tember 1989 with passive restraints. *See* 49 Fed.Reg. 28,962–63, 28,991, 28,996 (1984) (codified at 49 C.F.R. pt. 571 (1987)).

vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard.

15 U.S.C. § 1392(d) (1982). The manufacturers claim that this language preempts any state regulation, including a rule of common law,[16] that is not "identical" to the NHTSA safety standards which, at the time of the manufacture of the automobiles in this case, authorized manufacturers to install seat belts instead of airbags.

The Safety Act, however, also contains a "savings" clause, which provides:

Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law.

*Id.* § 1397(c). This clause could be read as authorizing the prosecution of "any" common law claims, including those that might establish a rule not identical to the NHTSA safety standards. To reconcile the apparent conflict between the Safety Act's preemption clause and its savings clause, the manufacturers urge us to interpret narrowly the savings clause as preserving common law liability only for those automobile safety defects that are not specifically addressed by a Safety Standard.

Under the construction urged by the manufacturers, the savings clause is deemed merely to indicate that while the NHTSA safety standards are exclusive when they apply, they are not exhaustive. In other words, as one court has concluded, "the clear meaning of the [savings] clause is that compliance with the federal standards does not protect an automobile manufacturer from liability for design or manufacturing defects in connection with matters not covered by the federal standards."

*Cox v. Baltimore County*, 646 F.Supp. 761, 764 (D.Md.1986). Such a construction, however, would render the savings clause a mere redundancy since the preemption clause itself provides that where a federal standard does not govern "the same aspect of performance" as the state standard, the state standard is not preempted. *See Chrysler Corp. v. Tofany*, 419 F.2d 499, 511 (2d Cir.1969) (no preemption of a safety standard issued by Vermont Department of Transportation that regulated an aspect of performance that was not covered by the NHTSA safety standards). Because we have a duty to give effect, if possible, to every clause of a statute, *see United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955), we are inclined to reject the manufacturers' construction since it would render an entire section of the Safety Act superfluous.

An additional factor militating against a finding that the language of the Safety Act expressly preempts appellants' claims is that Congress did not make explicit reference to state common law in the Act's preemption clause as it has in the preemption clauses of many other statutes. Congress has long demonstrated an aptitude for expressly barring common law actions when it so desires. *See, e.g.,* Domestic Housing and International Recovery and Financial Stability Act, 12 U.S.C. § 1715z–17(d), –18(e) (Supp. V 1987) (preempting any "State constitution, statute, court decree, common law, rule, or public policy"); Copyright Act of 1976, 17 U.S.C. § 301(a) (1982) (preempting rights "under the common law or statutes of any State"); Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1144(a), (c)(1) (1982) (preempting all state "laws, decisions, rules, regulations, or other State

---

**16.** If appellants prevailed in their tort claims, the effect would be similar to that produced by a state regulation requiring automobiles to be equipped with airbags as well as seat belts. The imposition of damages under state tort law has long been held to be a form of state regulation subject to the supremacy clause. As the Supreme Court explained in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), "regulation can be as effectively exerted through an award of dam-

ages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Id.* at 247, 79 S.Ct. at 780. In *Stephen v. American Brands, Inc.*, 825 F.2d 312 (11th Cir.1987), this court held that a state tort suit based on a theory of inadequate warning was preempted by the Federal Cigarette Labeling and Advertising Act because the suit had a regulatory effect.

action having the effect of law"). The absence of such an explicit reference to state common law in the Safety Act's preemption clause therefore counsels against a finding of express preemption. *See Stephen v. American Brands, Inc.*, 825 F.2d 312, 313 (11th Cir.1987) (adopting decision and reasoning of *Cipollone v. Liggett Group, Inc.*, 789 F.2d 181, 185–86 (3d Cir. 1986), *cert. denied*, 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987), which held that failure of preemptive language in federal Cigarette Labeling and Advertising Act to include an explicit reference to state common law claims was grounds for concluding that there was no express preemption); *Ferebee v. Chevron Chem. Co.*, 736 F.2d 1529, 1542–43 (D.C.Cir.) (same construction applied to Federal Insecticide, Fungicide, and Rodenticide Act preemption claim), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984).

The manufacturers urge us to attach little importance to this omission because, they claim, Congress in 1966 did not contemplate the possibility that a state tort action might exist that would effectively create a state design standard conflicting with a federal safety standard.[17] We find this argument unpersuasive. A review of tort law circa 1966 reveals that crashworthiness litigation, "although then a relatively recent phenomenon, was not so new as to catch the Congress unawares." *Wood v. General Motors Corp.*, 865 F.2d 395, 421 (1st Cir.1988) (Selya, J., dissenting). While the seminal case recognizing that automobile manufacturers can be held liable for injuries due to the impact of occupants against objects inside a vehicle as a result of a collision, *Larsen v. General Motors Corp.*, 391 F.2d 495 (8th Cir.1968), was not decided until two years after the passage of the Safety Act, the doctrine did not

emerge *ex nihilo*. Rather, the court in *Larsen* derived from existing cases and scholarly commentary what it deemed to be the next logical step in the evolution of design defect tort law. *See id.* at 504 (automotive industry not "being singled out for any special adverse treatment"; liability for design defects predicated upon established "general negligence principles"); *see also* Nader & Page, *Automobile Design and the Judicial Process*, 55 Calif.L. Rev. 645, 645 nn. 3, 4 (1967) (recognizing that by 1966 automobile crashworthiness suits were occasionally settled, and sometimes successful at the trial level).

Given the conflict between the language of the Safety Act's preemption and savings clauses, and the failure of Congress explicitly to include reference to state common law in the Act's preemption clause, we conclude that the Safety Act cannot be construed as unambiguously manifesting an intention to preempt appellants' common law claims. We therefore hold that appellants' claims are not expressly preempted by the Safety Act.[18]

### C.

Having found that the language of the Safety Act does not expressly preempt appellants' tort claims, we turn next to whether congressional intent to preempt appellants' claims may be inferred under the principles of implied preemption. Our analysis begins with the principle that federal law preempts state law when state law creates "a potential frustration of the administrative scheme provided by [the federal law]," *Howard v. Uniroyal, Inc.*, 719 F.2d 1552, 1562 (11th Cir.1983), or when the state law "interferes with the methods by which the federal statute was designed to

---

**17.** In 1966, the prevailing view was that automobile manufacturers had no duty to make their product safer to passengers in a collision. *See Evans v. General Motors Corp.*, 359 F.2d 822, 825 (7th Cir.) (holding that an automobile manufacturer has a duty to design its product to be reasonably fit for the purpose for which it was made and that purpose, as a matter of law, cannot contemplate the automobile's participation in a collision), *cert. denied*, 385 U.S. 836, 87 S.Ct. 83, 17 L.Ed.2d 70 (1966).

**18.** We conclude only that the language of the Safety Act is too ambiguous to manifest a Congressional intent to preempt appellants' common law claims under an express preemption analysis; we do not find to the contrary—that the Safety Act's savings clause unmistakably manifests an express intention on the part of Congress to preserve appellants' common law claims.

reach [its] goal." *International Paper Co. v. Ouellette,* 479 U.S. 481, 494, 107 S.Ct. 805, 813, 93 L.Ed.2d 883 (1987). This principle of implied preemption applies whether the federal law is embodied in a statute or a regulation, *see Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed. 2d 664 (1982) (holding that "[f]ederal regulations have no less pre-emptive effect than federal statutes"), and whether the state law is rooted in a statute, regulation, or common law rule. *See Stephen v. American Brands, Inc.,* 825 F.2d 312, 313 (11th Cir.1987) (adopting decision and reasoning of *Cipollone v. Liggett Group, Inc.,* 789 F.2d 181, 187 (3d Cir.1986), *cert. denied,* 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987), which held that "the duties imposed through state common law damage actions have the effect of requirements that are capable of creating an obstacle to the accomplishment and execution of the full purposes and objectives of Congress").

■ There are two important differences between the analysis we employ in determining whether a state law is expressly preempted by federal law and that which we use in approaching questions of implied preemption. First, in contrast to the strong presumption against preemption that we apply in determining whether the language of a federal statute or regulation expressly preempts state law, no such presumption is applicable in deciding whether state law conflicts with federal law, even where the subject of the state law is a matter traditionally regarded as properly within the scope of the states' rights. *See Felder v. Casey,* — U.S. —, —, 108 S.Ct. 2302, 2306, 101 L.Ed.2d 123 (1988) (" '[T]he relative importance to the State of its own law is not material when there is a conflict with a valid federal law,' for 'any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.' ") (quoting *Free v. Bland,* 369 U.S. 663, 666, 82 S.Ct. 1089, 1092, 8 L.Ed.2d 180 (1962)).

■ The second difference between express and implied preemption analysis is that in implied preemption analysis it is possible to infer preemptive intent solely from effects. Even where the preemptive intent behind the federal regulatory scheme is unclear from its statutory language or legislative history, the federal law nevertheless preempts the state law to the extent that the ordinary application of the two laws creates a conflict. *See Brown v. Hotel & Restaurant Employees & Bartenders Int'l Union,* 468 U.S. 491, 501, 104 S.Ct. 3179, 3185, 82 L.Ed.2d 373 (1984) (Where there is an "actual conflict" between federal and state law, the state law "is preempted by direct operation of the Supremacy Clause.").

■ We now examine the effect that permitting appellants to prosecute their claims would have on the federal regulatory scheme involved in this case. In its 1974 amendment to the Safety Act, Congress expressly approved the right of an automobile manufacturer to comply with the Safety Act either by installing manual seat belts or passive restraints. *See* Motor Vehicle and Schoolbus Safety Amendments of 1974, Pub.L. No. 93–492, § 109, 88 Stat. 1470 (codified at 15 U.S.C. § 1410b (1982)). Consistent with Congress' 1974 mandate, the regulations promulgated under the Safety Act authorized automobile manufacturers to choose one of three different methods to comply with the safety standards for occupant crash protection; one of those federally approved options was the installation of manual seat belts. *See* 39 Fed.Reg. 38,380 (1974). Congress subsequently endorsed the option authorized in the federal regulation by providing in 1978 and again in 1979 that "[n]one of the funds appropriated [for the Department of Transportation] shall be used to implement or enforce any standard or regulation which requires any motor vehicle to be equipped with an occupant restraint system (other than a belt system)." Department of Transportation and Related Agencies Appropriation Act, 1979, Pub.L. No. 95–335, § 317, 92 Stat. 435, 450 (1978); *see also* Department of Transportation and Related Agencies Appropriation Act, 1980, Pub.L. No. 96–131, § 317, 93 Stat. 1023, 1039 (1979).

In pressing their implied preemption arguments in this appeal, each side relies extensively on the legislative history of the Safety Act and Safety Standard 208. As is often the case with legislative history, however, both sides have succeeded in gleaning passages that bolster their contrary positions.[19] Although the ultimate intent of Congress may be indiscernible, the effect of the regulatory scheme established by the 1974 amendment to the Safety Act and Safety Standard 208 is unmistakable: it grants automobile manufacturers the option of complying with federal standards for occupant crash protection by installing manual seat belts instead of airbags.

The Supreme Court has held that, under the principles of implied preemption, a state cannot impose common law damages on individuals for doing what a federal act or regulation "authorized them to do." *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318, 101 S.Ct. 1124, 1131, 67 L.Ed.2d 258 (1981); *see also Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 524, 101 S.Ct. 1895, 1907, 68 L.Ed. 2d 402 (1981) (holding that the Employee Retirement Income Security Act of 1974 preempted state law which "eliminates one method for calculating pension benefits [ ] that is permitted by federal law"). The Supreme Court's opinion in *Fidelity Federal Savings & Loan Association v. de la Cuesta*, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), demonstrates the rule. In that case, a federal regulation permitted federal savings and loan associations at their option to include a due-on-sale clause in loan instruments, and the defendant federal savings and loan association exercised its option to include the clause. Plaintiff borrowers sued the association for damages, and claimed the due-on-sale clause in their loan instrument was unenforceable under a rule of California common law. The Supreme Court held that the federal regulation preempted the California common law because the common law rule prohibited the exercise of the federally authorized option:

> The conflict does not evaporate because the Board's regulation simply permits, but does not compel, federal savings and loans to include due-on-sale clauses in their contracts and to enforce those provisions when the security property is transferred. The Board consciously has chosen not to mandate use of due-on-sale clauses "because [it] desires to afford associations the flexibility to accommodate special situations and circumstances." 12 C.F.R. § 556.9(f)(1) (1982). Although compliance with both § 545.8–3(f) and the [state common law] rule may not be "a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. [132] at 142–43, 83 S.Ct. [1210] at 1217 [10 L.Ed.2d 248 (1963)], the California courts have forbidden a federal savings and loan to enforce a due-on-sale clause solely "at its option" and have deprived the lender of the "flexibility" given it by the Board.

*Id.* at 155, 102 S.Ct. at 3023. (footnote omitted).

*de la Cuesta* governs this case. It holds that a state common law rule cannot take away the flexibility provided by a federal regulation, and cannot prohibit the exercise of a federally granted option. *See id.* In accordance with *de la Cuesta*, we conclude that a state common law rule that would, in effect, remove the element of choice authorized in Safety Standard 208 would frustrate the federal regulatory scheme. We therefore hold that appellants' theory of recovery is impliedly preempted by Safety Standard 208 and the Safety Act.[20]

---

**19.** For example, the manufacturers cite passages in the legislative history suggesting that Congress intended that the standards governing crash protection be uniform throughout the country. *See, e.g.,* H.R.Rep. No. 1776, 89th Cong., 2d Sess. 17 (1966); 112 Cong.Rec. 14,232, 14,253 (1966). Appellants counter by citing passages suggesting that the reduction of traffic fatalities was the overriding concern of Congress. *See, e.g.,* S.Rep. No. 1301, 89th Cong., 2d Sess. 6, *reprinted in* 1966 U.S.Code Cong. & Admin.News 2709, 2714. No materials, however, have come to our attention that can be deemed dispositive of the issue of Congress' preemptive intent.

**20.** In so holding, we reject the appellants' argument that the Safety Act's savings clause forecloses a finding of implied preemption. *See Wood v. General Motors Corp.*, 865 F.2d 395,

## III.

In sum, we find that Florida's tort law doctrines of strict liability and negligence would recognize a claim against a manufacturer for its failure to equip an automobile with airbags, but hold that such a claim is preempted by federal law. We therefore affirm the district court's dismissal of appellants' suit.

AFFIRMED.

415–16 (1st Cir.1988) (citing *International Paper Co. v. Ouellette,* 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987), and *Texas & Pacific Railway v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907), for the proposition that a "general" savings clause, such as that

contained in the Safety Act, does not preclude a finding of implied preemption).