3M HEALTH CARE, LTD.,
Plaintiff–Appellant,

v.

Richard R. GRANT, Administrator, Pharmacy Program, Florida Department of Health and Rehabilitative Services, State of Florida, Defendants–Appellees.

No. 89–6100.

United States Court of Appeals,
Eleventh Circuit.

Aug. 13, 1990.

Edward M. Joffe, Sandler, Travis & Rosenberg, Miami, Fla., for plaintiff-appellant.

George L. Waas, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for defendants-appellees.

Before FAY and JOHNSON, Circuit Judges and GIBSON *, Senior Circuit Judge.

* Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

FLOYD R. GIBSON, Senior Circuit Judge:

Appellant, 3M Health Care, Ltd. ("3M"), sued the State of Florida and others in federal district court, seeking declaratory and injunctive relief from compliance with Florida's Drug and Cosmetic Act in its warehousing activities in the Port Everglades Foreign Trade Zone. 3M argued that the state law was preempted by the Foreign Trade Zones Act. The district court disagreed, granted summary judgment to Florida, and dismissed 3M's action. We reverse on the grounds that the Florida law as applied in this factual situation frustrates the congressional intent behind the Foreign Trade Zones Act.

## I. FACTS

Because the case has come to us on appeal of summary judgment, we construe the facts in the light most favorable to 3M, the Appellant. *Stephens v. Department of Health and Human Services*, 901 F.2d 1571, 1573 (11th Cir.1990). 3M Health Care, Ltd. is a British subsidiary of the 3M Corporation headquartered in St. Paul, Minnesota. 3M Riker U.K. is the name under which 3M Health Care, Ltd. does business in the Port Everglades Foreign Trade Zone (the "zone") in Florida.

Foreign trade zones were created by the Foreign Trade Zones Act of 1934.[1] The act authorizes a board to create trade zones at ports of the United States through which goods can pass without being subject to United States customs duties. *See* 19 U.S.C. § 81c (1988); *Nissan Motor Mfg. Corp., U.S.A. v. United States*, 884 F.2d 1375, 1376 (Fed.Cir.1989). The purpose of the act is simple and express: "[t]o provide for the establishment, operation, and maintenance of foreign-trade zones in ports of entry of the United States, to expedite and encourage foreign commerce, and for other purposes." Foreign Trade Zones Act, ch. 590, 48 Stat. 998 (1934). Though the goods in a zone are exempt from customs duties, the Customs Service is present in the zones to oversee their operation. *See* Foreign Trade Zones, 19 C.F.R. § 146.3 (1989); *A.T. Cross Co. v. Sunil Trading Corp.*, 467 F.Supp. 47, 51 (S.D.N.Y.1979).

Since 1982, 3M Riker U.K. has transshipped pharmaceutical and other products through the zone at Port Everglades, Florida, to Latin American and Caribbean countries. 3M Riker U.K. does not manufacture any of the goods, but other 3M affiliates do. 3M Riker U.K. uses the zone for storage, handling, repackaging, and shipping of the goods. Purchasers in Latin America and the Caribbean send orders to a 3M office in Miami, Florida, which sends the order information to 3M Riker U.K. headquarters in Britain. The orders are then filled and shipped from the 3M warehouse in the zone.

3M does not ship any of the pharmaceutical goods from the zone into the United States for domestic sale. In fact, none of them are approved for sale in the United States by the Food & Drug Administration. Only one of the goods is manufactured in the United States—by a Californian affiliate of 3M. That product, like all the others, is only transshipped through the zone for Latin American purchasers.

In November of 1988, the Florida Department of Health and Rehabilitative Services, pursuant to Florida law, served 3M Riker U.K. with notice that it intended to enter and inspect the 3M warehouse in the zone to determine compliance with Florida's Drug & Cosmetic Act.[2] Florida again

---

**1.** Foreign Trade Zones Act, ch. 590, 48 Stat. 998 (1934) (codified as amended at 19 U.S.C. §§ 81a–81u (1988)).

**2.** Fla.Stat.Ann. §§ 499.001–499.79 (West 1988). The intent of the act as expressed therein is to: (1) [s]afeguard the public health and promote the public welfare by protecting the consuming public from injury by product use, and protecting the purchasing public from injury by merchandising deceit, flowing from intra-

state commerce in drugs, devices, and cosmetics.

\*    \*    \*    \*    \*    \*

*Id.* at § 499.002.

The State of Florida describes its powers and duties under the Drug & Cosmetic Act in its brief as follows:

The State of Florida, through its Department of Health and Rehabilitative Services (HRS), licenses, regulates, and polices drug wholesalers to safeguard the public health

served notice on 3M Riker U.K. in December of 1988 and in March of the following year. Florida took the view that 3M had to be licensed as a drug wholesaler under Florida law to conduct its operations in the zone. 3M, of course, took the contrary view and so indicated in a letter to the state's Pharmacy Program Administrator in January of 1989.

Finally, on Friday, March 24, 1989, Florida served 3M with an administrative subpoena requiring the company to appear the following Monday by representative with certain documents concerning the pharmaceuticals shipped through the zone. 3M did not comply with the subpoena, but instead filed this action in federal district court on March 31, 1989. 3M sued the State of Florida, its Department of Health and Rehabilitative Services, and the Administrator of the Department's Pharmacy Program, Richard Grant. 3M's complaint asked for a declaratory judgment that the Florida law was preempted by the Foreign Trade Zones Act and for appropriate injunctive relief. Defendant Grant responded by general denial, while the State and its Department of Health and Rehabilitative Services sought to dismiss 3M's action against them based on Eleventh Amendment immunity.[3]

The case went to summary judgment consideration by the district court after cross-motions by the parties. The district court concluded that Florida's regulation of pharmaceuticals flowing into its commerce under the Drug & Cosmetic Act was a valid exercise of police power not preempted by the Foreign Trade Zones Act. 3M took this appeal.

## II. ANALYSIS

This case presents the familiar and necessary problem that arises from the conflict between concurrent state and federal jurisdiction. Its resolution implicates the principles of federalism. While our nation operates as a republic of individual states, when a conflict arises between the laws of a state and the nation, the law of the nation controls. Supremacy Clause, U.S. Const. art. VI. Though the analysis is more complicated than that, we believe this case resolves itself on rather simple facts. The question to be answered is whether 3M must, within a foreign trade zone, abide by Florida's Drug & Cosmetic Act in its warehousing of export-only pharmaceuticals. If federal law preempts the state law, 3M need not meet the state requirements.

■ The law of preemption was explained in a recent case from this court:

> Federal law may preempt state law in three ways. First, Congress, in drafting a statute, may use language that dictates the extent to which the statute preempts state law. Second, despite the absence of such language, the wording of the statute or its legislative history may evince Congress' intent to occupy a given regulatory field to the exclusion of state law. Third, even when Congress has not occupied the entire regulatory field, federal law nevertheless may implicitly preempt state law to the extent that state law conflicts with a federal regulatory scheme.

*Taylor v. General Motors Corp.*, 875 F.2d 816, 822 (11th Cir.1989) (citations omitted), *cert. denied*, — U.S. ——, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990).

■ The first two kinds of preemption are not applicable in this case. Congress did not express in the Foreign Trade Zones Act the extent to which the act might

from injury by misbranded or adulterated medicinal drugs and protect the public from injury by fraud or deceit. Licensing of drug wholesalers allows HRS to set up the administrative activities necessary to monitor the flow of medicinal drugs into, within, and out of the State of Florida.
Appellees' Brief at 5 (citation omitted).
Chapter 893 of the Florida Statutes, the Florida Comprehensive Drug Abuse Prevention and Control Act, is tangentially implicated in this

case. Under Chapter 499, inspections by the state are to determine compliance with Chapters 499, 893, and 465. Fla.Stat.Ann. § 499.051 (West Supp.1990). However, it is only Chapter 499's operation that is under review by us.

3. The district court did not discuss this question in its final order of summary judgment. The Appellees have not argued it to us. We express no view on the subject.

preempt state laws. Nor has Congress, by statute or legislative history, indicated that it intended to occupy the field of wholesale pharmaceutical law to the exclusion of the state of Florida. In fact, the Foreign Trade Zones Act has nothing whatever to do with pharmaceuticals, per se, as the Florida act does. The two are operating, in part, on different planes. The federal act seeks to regulate how goods can flow through special zones to avoid the customs duties of the United States, while the state act seeks to regulate pharmaceuticals in the commerce of Florida. Thus, there is room for the two laws to operate coextensively, to the extent that the state law does not conflict with the federal law. Though the Foreign Trade Zones Act says nothing about pharmaceuticals, that does not mean that Florida's Drug & Cosmetic Act as applied will not create a conflict with the Foreign Trade Zones Act which might require preemption of Florida law.

"Such a conflict will be found when the state law ' "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' *Hillsborough County v. Automated Medical Laboratories, Inc.*, [471 U.S. 707] at 713 [105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985)] (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581] (1941) [footnote omitted] )." *International Paper Co. v. Ouellette*, 479 U.S. 481, 491–92, 107 S.Ct. 805, 811–12, 93 L.Ed.2d 883 (1987). In *Taylor*, this court described it thusly:

> federal law preempts state law when state law creates "a potential frustration of the administrative scheme provided by [the federal law]," *Howard v. Uniroyal, Inc.*, 719 F.2d 1552, 1562 (11th Cir.1983), or when the state law "interferes with the methods by which the federal statute was designed to reach [its] goal." *International Paper Co. v. Ouellette*, 479 U.S. 481, 494, 107 S.Ct. 805, 813, 93 L.Ed.2d 883 (1987).

*Taylor*, 875 F.2d at 825–26.

Here the goal of the Foreign Trade Zones Act is straightforward—to facilitate the use of U.S. ports for the transshipment of goods in foreign commerce. The use of our ports for the warehousing of goods in international trade was considered an endeavor worthwhile enough to exempt such goods from customs duties and thus to make the use of our ports as easy as possible for transshipment. The zones are to operate with few formalities to encourage the use of our ports. While the exemption from customs duties is likely the single-most attractive feature that so encourages use of the zones, it alone cannot ensure the use of the zones as Congress intended if the states are free to encumber zone operations with multifarious regulations over goods in which they have no interest. To the extent that Florida law would encumber the ease of transshipment through the zones by requiring unnecessary regulation of goods in which it has no interest, it frustrates the goal of the Foreign Trade Zones Act.[4]

Florida's attempted regulation of 3M's warehousing of pharmaceuticals destined for Latin America is clearly unnecessary. Without going into all the details of the Florida Drug & Cosmetic Act, we conclude that, as sought to be applied in this case, it interferes with the objects and goals of the Foreign Trade Zones Act. Florida, for example, would have the power pursuant to its law to inspect 3M's warehouse in the zone and prevent shipment of (or conceivably destroy) those 3M products that meet a foreign market's standards but that do not

---

4. We do not read 19 C.F.R. § 146.4(f) (1989), as Florida suggests, to empower the state to regulate where it has no interest. That section directs that:

> The [zone] operator shall store and handle merchandise in a zone in a safe and sanitary manner to minimize damage to the merchandise, avoid hazard to persons, and meet local, state, and Federal requirements applicable to a specific kind of goods.

That direction is to the zone operator, not the state. The applicable local and state requirements with which the operator must comply to ensure safe and sanitary operation of the zone are necessarily only those requirements that are not otherwise preempted by federal law, as we ultimately conclude Florida's requirements as applied to 3M are in this case.

meet Florida's standards. *See*, Fla.Stat. Ann. § 499.051 (West Supp.1990) and Fla. Stat.Ann. §§ 499.06, 499.062, 499.063 (West 1988). Nevertheless, it is not so much the requirements of Florida's law themselves that obstruct the purposes of the Foreign Trade Zones Act—the law in the right circumstance would be a valid exercise of police powers—it is the fact that Florida seeks to use its law to regulate foreign goods that legally cannot enter the commerce of the United States in a place set aside by Congress for ease and economy of transshipment of such goods that is obstructive of the federal law's purpose to attract foreign trade in a global market.[5]

We disagree with the district court that Florida has any public health or safety interest in goods that never enter the commerce of the United States, much less the commerce of Florida. *See* Order of Final Summary Judgment at 7. The police powers of a state are especially strong to protect its citizens from harm, yet they are effective only over activities in the state. While the zone is located within the boundaries of the state, the warehousing done by 3M in the zone has nothing to do with Florida. It is not that the zone is a federal enclave beyond the reach of all of Florida's

laws, it is simply that the activities of 3M in the zone cannot be said to be of interest to Florida for purposes of its police powers. If 3M were shipping these goods into Florida, then Florida's authority to regulate in the zone would likely be certain. If that were the case, the Customs Service would also be more closely involved because foreign goods would be entering the commerce of the United States.

But as the facts lie here, 3M does not bring goods into Florida or any other state. Rather, 3M seeks only to use the zone for its intended purpose—to warehouse goods travelling in foreign commerce. 3M could do that anywhere a sovereign permitted; apparently 3M at one time used warehousing facilities in Panama and Jamaica. That 3M uses a warehouse in a zone in the physical boundaries of Florida does not alone give Florida a safety or health interest in goods that cannot enter its commerce. Unless and until 3M also brings goods into the commerce of Florida, it cannot regulate 3M's warehousing of pharmaceuticals without unnecessarily complicating the ease with which Congress intended foreign trade zones to be used for transshipment and without unnecessarily contravening congressional intent.[6]

---

5. Florida has argued that contraband does leak out of foreign trade zones either by fault of the Customs Service or the operators of the zones and warehouses. Even if that is taken by us to be true, while we acknowledge the grave problem that illicit drug traffic can present a state, still we cannot find room for state police powers to operate over export-only goods that never legally enter the commerce of the United States while they are warehoused in a foreign trade zone. To conclude otherwise would suggest that Florida was free to inspect, for example, drugs warehoused in Georgia or Alabama, on the belief that those places were the source of contraband entering Florida's commerce.

6. Our analysis here has been informed by the treatment the United States Supreme Court gave preemption analysis when dealing with goods destined only for foreign markets and those destined for domestic markets as well. In *Xerox Corp. v. County of Harris, Texas*, 459 U.S. 145, 103 S.Ct. 523, 74 L.Ed.2d 323 (1982), the Court found local ad valorem taxes on copy machines stored in customs-bonded warehouses and destined for foreign markets were preempted by federal customs laws, while in *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 107 S.Ct. 499, 93 L.Ed.2d 449 (1986), the

Court concluded that a local ad valorem tax on tobacco in customs-bonded warehouses was not preempted by federal customs laws because the tobacco was destined for domestic manufacture and domestic markets. The Court expressly distinguished *Xerox* on its foreign market facts. *Id.* 459 U.S. at 141–44, 103 S.Ct. at 521–22.

While we recognize that the imposition of ad valorem taxes is not the equivalent of Florida's exercise of police power in this case, we believe the Supreme Court's emphasis on the facts that the goods in *Xerox* were being transshipped (to, coincidentally, Latin America) and were not for domestic sale lends support to our emphasis on the similar facts of this case and our finding of preemption. Thus, while the Court in *R.J. Reynolds* did not believe "the purposes in forming the customs-bonded warehouse scheme identified by the Court in *Xerox* would be disserved by the imposition of ad valorem property taxes on Reynolds' imported tobacco[,]" *id.* 459 U.S. at 144, 103 S.Ct. at 522, we believe Congress' purposes in creating foreign trade zones would be disserved by the imposition of Florida's Drug & Cosmetic Act, regulations, and operation on 3M's transshipment of pharmaceuticals through the zone.

*Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960), is not contrary authority.[7] In *Huron,* the City of Detroit had imposed an air pollution ordinance on vessels in its port which required modifications to ships' boilers despite the fact that the ships had already passed inspection by the federal government and had received licenses to operate in navigable waterways. The Court concluded that the federal inspection law was "limited to affording protection from the perils of maritime navigation," while "the sole aim of the Detroit ordinance [was] the elimination of air pollution to protect the health and enhance the cleanliness of the local community." *Id.* 362 U.S. at 445, 80 S.Ct. at 817 (citations omitted). Thus there was room for the Detroit ordinance to operate alongside the federal law because "there [was] no overlap between the scope of the federal ship inspection laws and that of the municipal ordinance ... involved." *Id.* at 446, 80 S.Ct. at 817 (footnote omitted). The ships in Detroit's port, despite their federal licenses, were actually polluting the air in violation of the Detroit ordinance. A federal license did not "immunize a ship from the operation of the normal incidents of local police power, not constituting a direct regulation of commerce." *Id.* at 447, 80 S.Ct. at 818.

In this case, however, Florida has attempted to do more by its Drug & Cosmetic Act with respect to 3M's transshipments than Detroit did by its pollution ordinance. While Detroit had an interest in the quality of its air, Florida has no interest in pharmaceuticals that cannot by law enter its commerce. There is nothing in this record that indicates Florida is being polluted with illegal pharmaceuticals by 3M's legal operation of a warehouse in a federally authorized foreign trade zone the way that Detroit's air was being polluted by the smoke of federally licensed ships. To the extent that Florida has attempted to extend its

police powers over the operation of 3M's warehousing of export-only pharmaceuticals, Florida has attempted to directly regulate commerce and is impliedly preempted from doing so by congressional intent manifested in the Foreign Trade Zones Act and its regulations.

## III. CONCLUSION

As applied to 3M Health Care Ltd.'s operations in the Port Everglades Foreign Trade Zone, the Florida Drug & Cosmetic Act is preempted by the Foreign Trade Zones Act. The district court's order of final summary judgment to Defendants–Appellees is REVERSED, and the cause is REMANDED for entry of summary judgment in favor of 3M Health Care, Ltd. and other proceedings consistent with this opinion.

---

7. We address *Huron* because of the district court's reliance thereon. Discussion of the numerous preemption cases from the Supreme Court and elsewhere is unnecessary, because "verbal generalizations do not of their own mo-

tion decide concrete cases[.]" *Huron* 362 U.S. at 444, 80 S.Ct. at 816. We have outlined the applicable legal framework and resolve this case on its own peculiar facts. *See id.*