884 P.2d 183

**Amparo HERNANDEZ–GOMEZ, Petitioner,**

v.

**Hon. John S. LEONARDO, Judge of the Superior Court of the State of Arizona, in and for the County of Pima, Respondent,**

Volkswagen of America, Inc., a New Jersey Corporation, and Volkswagenwerk Aktiengesellschaft, a Foreign Corporation, Real Parties in Interest.

**No. CV–93–0202–PR.**

Supreme Court of Arizona, En Banc.

Nov. 1, 1994.

Haralson, Kinerk & Morey, P.C. by Gregory G. Wasley and D. Dale Haralson, Tucson, for petitioner.

Fennemore Craig, P.C. by Timothy Berg, William T. Burghart and Joseph P. Mikitish, Phoenix, and Herzfeld & Rubin by Craig L. Winterman, Los Angeles, CA, for real parties in interest.

## OPINION

FELDMAN, Chief Justice.

The court of appeals denied special action relief in this case and we granted review to

consider an issue of first impression in this state: Does the National Traffic and Motor Vehicle Safety Act (the Safety Act) preempt a state law tort action against a car manufacturer that did not incorporate a lap belt in its passive restraint system?

We have jurisdiction under Ariz. Const. art. 6, § 5(3) and Ariz.R.P.Spec. Act. 8.

## FACTS AND PROCEDURAL HISTORY

The operative facts are few and undisputed. On November 6, 1988, Amparo Hernandez–Gomez (Plaintiff) was riding in the right front seat of a 1981 Volkswagen Rabbit when the driver briefly took his eyes off the road. Travelling between 30 and 35 miles per hour, the car veered off the road and ran down an embankment. It struck a drainage culvert, flipped over, and landed on its roof. Plaintiff's head and shoulders smashed against the car's roof causing a spinal cord injury that has left her paraplegic.

Plaintiff alleges that the design of the car's safety restraint system failed to adequately protect her from a foreseeable rollover and actually enhanced her injuries. The restraint system consisted of a shoulder belt that automatically moved into place diagonally across the chest when the door was shut, a knee bolster, and a seat designed to prevent the occupant from submarining under the dashboard in a head-on collision. Because it was designed to be fully automated, the system did not include a manual lap belt that arguably would have prevented Plaintiff from being thrown against the roof of the car. Plaintiff claims that the absence of a lap belt made the car defective and unreasonably dangerous to its occupants.

On January 15, 1993, Volkswagen of America and Volkswagenwerk Aktiengesellschaft (collectively VW) moved for partial summary judgment, arguing that the car's passive restraint system [1] complied with federal design and performance standards, which required

no lap belt. So finding, and concluding that the Safety Act preempted state tort law so that compliance with the Act insulated the manufacturer from common-law liability, the trial judge granted partial summary judgment in VW's favor on March 16, 1993.

Seeking relief from the trial court's order, Plaintiff brought a special action [2] before the court of appeals, which declined jurisdiction on April 20, 1993. This court then accepted review of the following issues:

1. Whether the trial court incorrectly interpreted and applied the principles of federal preemption set forth in the recent U.S. Supreme Court case of *Cipollone* so as to abrogate Plaintiff's right to bring an action to recover damages for injuries resulting from negligent and/or defective design.

2. Whether common law product liability actions brought in Arizona are preempted by the Safety Act or [Federal Motor Vehicle Safety Standards].

The fundamental question is whether an automobile manufacturer can be liable under state tort law for a product design defect when that design meets Safety Act standards.

## DISCUSSION

### A. The Safety Act and Its Standards

Congress passed the Safety Act (15 U.S.C. § 1381 *et seq.*) in 1966 "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." [3] Congress authorized the Secretary of Transportation to formulate safety standards to protect the motoring public against an unreasonable risk of injury due to "the design, construction or performance of motor vehicles...." [4] The Secretary of Transportation delegated the duty of writing Federal Motor Vehicle Safety Standards to the National Highway Transportation Safety Administration (Safety Administration). 49 C.F.R. § 1.50. The federal

---

**1.** A passive restraint system protects the occupant "by means that require no action by vehicle occupants...." 49 C.F.R. § 571.208 S4.1.2.2(b) (1988).

**2.** In Arizona, relief formerly obtained by writs of prohibition, mandamus, or certiorari is now ob-

tained by "special action." Ariz.R.P.Spec. Act. 1.

**3.** Former 15 U.S.C. § 1381.

**4.** Former 15 U.S.C. § 1391(1). *See* text.

safety standards appear at 49 C.F.R. §§ 571.1 to 571.302.

The relevant safety standards are "Occupant Crash Protection," 49 C.F.R. § 571.208 (Standard 208), and "Seat Belt Assemblies," 49 C.F.R. § 571.209. Since the inception of these standards, there has been a national controversy on the question of whether passive restraints such as airbags should be mandatory or optional. Standard 208 originally required nothing more than seatbelts in newly manufactured automobiles. The United States Supreme Court cited 32 Fed.Reg. 2415 as the primary source. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*, 463 U.S. 29, 34, 103 S.Ct. 2856, 2862, 77 L.Ed.2d 443 (1983). Responding to sporadic seatbelt use by the public and a high rate of traffic injuries and fatalities, in 1969 the Department of Transportation began requiring installation of passive restraints in new cars. *Id.* at 35, 103 S.Ct. at 2862.

The Safety Administration reviewed two kinds of passive restraint crash protection systems—airbags and automatic seatbelts. Keith C. Miller, *Deflating the Airbag Preemption Controversy*, 37 EMORY L.J. 897, 902 (1988). Over the next fifteen years, other passive restraint systems were proposed and rejected due to their unpopularity with the public or carmakers. In addition, changes in administrations and national priorities during these years brought a number of successors with different agendas to the position of Secretary of Transportation. As a result, about sixty rulemaking notices were issued that "imposed, amended, rescinded, reimposed, and now rescinded again" the requirement for car manufacturers to install passive restraints. *Motor Vehicle Mfrs.*, 463 U.S. at 34, 103 S.Ct. at 2862.[5]

In effect since 1973, Standard 208 allowed manufacturers to choose one of three options for cars made between 1973 and 1986. Passive protection need not be by airbag but must meet specific Standard 208 criteria. By giving carmakers a choice of safety restraint options, Congress hoped to stimulate research, development, and competition. S.Rep. No. 1301, 89th Cong., 2d Sess. 1, 4 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2709, 2712. The element of choice is considered a central feature of the Safety Act's regulatory scheme. *See, e.g., Pokorny v. Ford Motor Co.*, 902 F.2d 1116, 1123 (3d Cir.), *cert. denied,* 498 U.S. 853, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990); *Taylor v. General Motors Corp.*, 875 F.2d 816, 827 (11th Cir.1989), *cert. denied,* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990).

The industry's reluctance to install airbags has led to numerous lawsuits against carmakers by people injured in automobiles not equipped with airbags. *See, e.g., Wood v. General Motors Corp.*, 865 F.2d 395, 400 (1st Cir.1988) ("In addition to the present action, about two dozen other suits have been recently filed claiming that an automobile was defectively designed because it lacked passive [airbag] restraints."), *cert. denied,* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 782 (1990). The issue in those cases—whether, in light of the Safety Act options permitting but not requiring airbags, a manufacturer can be liable in a common-law action for not installing an airbag—parallels the issue here. In the present case, instead of an airbag claim, Plaintiff sued the carmaker for failing to install a lap belt even though the Safety Act allegedly permitted the option of a two-point passive restraint system without a manual lap belt. We recognize, as did the Supreme Court and the Safety Administration, that airbags and three-point seatbelts significantly reduce traffic accident injuries and fatalities.[6]

---

**5.** The issue in *Motor Vehicle Mfrs.* concerned whether the Safety Administration's rescission of the passive restraint requirement was arbitrary and capricious and violated the Safety Act. By failing to consider an airbag-only option, the Court suspected the agency was acquiescing to an industry preference for the automatic seatbelt design. *463 U.S. at 49, 103 S.Ct. at 2870.* Finding that the purpose of the Safety Act was to arouse an automobile industry inert to safety concerns, the Court remanded for the agency's reconsideration. *Id.* at 57, 103 S.Ct. at 2874.

**6.** *Motor Vehicle Mfrs.*, 463 U.S. at 34–35, 103 S.Ct. at 2862; United States Department of Transportation, National Safety Belt Usage Program, *Progress and Assessment Report on the National Safety Belt Usage Program* 2 (Sept. 1983) (estimating that lap belt use could reduce fatalities and serious injuries by 50 to 60 percent each year).

## B. The Car's Crash Protection System—Compliance with Standards

For this 1981 model car, VW attempted to comply with one of the available options by designing a belt-type passive restraint system for the front-seat occupants. The design used an automatic two-point shoulder belt with no lap belt. In its motion for summary judgment, VW offered evidence that this restraint system satisfied Standard 208 and that a lap belt was not required to comply with option two. Finding that Plaintiff did not produce evidence sufficient to raise a genuine issue of material fact on the question of compliance, the trial judge held that the car's passive restraint system satisfied Standard 208. The court concluded, therefore, that the Safety Act preempted Plaintiff's claim and granted VW's motion for summary judgment.[7]

For purposes of this opinion, we assume that the trial judge correctly decided that the design in question complied with option two. Thus we address only the preemption issue.

## C. Preemption and Savings Clauses and Federal Preemption Doctrine

When this court accepted jurisdiction, the relevant sections of the Safety Act appeared at 15 U.S.C. § 1392(d) (1994 supp.) (preemption clause) and § 1397(k) (1994 supp.) (savings clause). Congress revised the language and recodified these subsections at 49 U.S.C. § 30103(b) and (e), respectively, effective July 5, 1994. Because the parties' briefs referred to the prior sections and language,

we use those citations. The original preemption clause provided in relevant part:

Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, *no State or political subdivision of a State shall have any authority either to establish, or to continue in effect,* with respect to any motor vehicle or item of motor vehicle equipment *any safety standard applicable to the same aspect of performance* of such vehicle or item of equipment *which is not identical to the Federal standard.* Nothing in this section shall be construed as preventing any State from enforcing any safety standard which is identical to a Federal safety standard.

15 U.S.C. § 1392(d) (1992 supp.) (emphasis added).[8]

The applicable savings clause provided:

**Continuation of common law liability**
*Compliance* with any Federal motor vehicle safety standard issued under this subchapter *does not exempt any person from any liability under common law.*[9]

15 U.S.C. § 1397(k) (1992 supp.) (emphasis added).

■■■ The Supremacy Clause allows Congress to make laws that supersede state law.[10] Federal regulations may also preempt state law. *Hillsborough County v. Automated Medical Lab., Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985). In determining whether a federal law preempts a state's statute, the "sole task is to ascertain the intent of Congress." *California Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272,

---

7. An identical claim was made against VW in *O'Bryan v. Volkswagen of America, Inc.,* 838 F.Supp. 319 (W.D.Ky.1992). Based on the Safety Administration's interpretations of its requirements, the district court in *O'Bryan* similarly found that VW's two-point passive restraint system met the requirements of Standard 208's option two and that the federal standard preempted state law damage claims. *Id.* at 324.

8. We note two obvious effects of the revised language in 49 U.S.C. § 30103(b). First, whereas the old provision was phrased to prohibit states from continuing or enacting nonidentical regulatory standards, the new provision permits states to enact standards only if they are identical to the federal standards. And second, subordinate clauses have been rearranged in the new preemption clause to make the text more reada-

ble. We do not consider these changes substantively significant.

9. Because federal doctrine generally avoids establishing a federal common law, we take the phrase "common law" in the 1966 statute as a reference to state common law. *See Texas Indus. v. Radcliff Materials,* 451 U.S. 630, 640, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981) (noting that there is no federal common law except in a "few and restricted" instances.).

10. U.S. Const. art. VI, cl. 2 states:

This Constitution, and the Laws of the United States ... shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987). However, there is a strong presumption against preemption of a state's police power. *Cipollone v. Liggett Group, Inc.*, 505 U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992). Preemption analysis:

> [S]tart[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. This assumption provides assurance that the federal-state balance will not be disturbed unintentionally by Congress or unnecessarily by the courts. But when Congress has unmistakably ordained that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall. This result is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.

*Jones v. Rath Packaging Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977) (citations and quotes omitted).

█ Wherever possible we must divine intent from statutory text. *State ex rel. Corbin v. Pickrell*, 136 Ariz. 589, 594, 667 P.2d 1304, 1309 (1983) ("The language of a statute is the most reliable evidence of its intent, and in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive."). The text seems quite clear. Obviously, the preemption and savings clauses must be construed together. State regulatory action that conflicts with the Safety Act is prohibited, but state common-law tort claims are saved and survive. Textually, the two provisions have a clear and unambiguous meaning. Further, we *presume* against preemption of state common-law and refuse to find preemption absent an explicit textual statement of legislative intent. *Hayes v. Continental Ins. Co.*, 178 Ariz. 264, 273, 872 P.2d 668, 677 (1994) (Arizona statute does not preempt state court jurisdiction over bad faith claims against workers' compensation carriers).

Were we writing on a clean slate in 1966—before other courts began stirring the waters of the Safety Act's preemptive reach—we would find the claims asserted in this case expressly *not* preempted and would effectively end the opinion at this point.

However, unlike *Hayes*, we deal not with a state statute but with an act of Congress. Thus, federal rather than state law must govern. Further, this is 1994 and we do not write on a clean slate. Since 1966, many courts have considered preemption under the Safety Act, often finding preemption on the issue before us. Although the United States Supreme Court has not decided the issue and we therefore are not constrained by binding authority, respect for federal circuit opinions interpreting a federal statute obviously compels us to consult federal authority.

Notwithstanding the language of the savings clause, a number of federal courts have found *implied preemption* of state common-law tort claims against carmakers for not installing airbags in their cars. They found the Safety Act's preemption clause ambiguous because it did not expressly place such claims outside preemptive reach. *Wood*, 865 F.2d at 412.[11] The courts determined that a state law damage award could effectively establish a standard not identical to the federal standard for the same feature and thus thwart the intended flexibility of the options allowed by Standard 208. These no-airbag claims would conflict with congressional intent to give manufacturers a choice of restraint system designs. *Taylor*, 875 F.2d at 827 ("[A] state common law rule ... would, in effect, remove the element of choice authorized in Safety Standard 208 [and] would frustrate the federal regulatory scheme."); *see also Pokorny*, 902 F.2d at 1123; *Wood*, 865 F.2d at 408.

Each of these courts concluded that the Savings Clause does not preserve common law damage actions that would subvert federal objectives and methods. One district judge concluded that "courts have declared,

---

**11.** *See also Pokorny*, 902 F.2d at 1126; *Kitts v. General Motor Corp.*, 875 F.2d 787, 789 (10th Cir.1989), *cert. denied*, 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990); *Taylor*, 875 F.2d at 827. *Cf. Perry v. Mercedes Benz of North Am., Inc.*, 957 F.2d 1257, 1265 (5th Cir.1992) (implied preemption only where there is an *actual conflict* with the "objectives and methods of the federal scheme").

almost with one voice, that the Safety Act *impliedly* preempts [conflicting common-law] liability, *even though its express preemption clause may be insufficient to accomplish the task.*" *Gills v. Ford Motor Co.*, 829 F.Supp. 894, 896 (W.D.Ky.1993) (first emphasis in original; second emphasis added).

■■■ Thus, consulting federal decisions in the years following enactment of the Safety Act, we might have been constrained to adopt the view of the federal courts and find implied preemption of a class of state common-law actions, notwithstanding our reading of the text and consequent reluctance to do so. *Hayes*, 178 Ariz. at 273, 872 P.2d at 677. However, the Supreme Court decision in *Cipollone* casts an entirely different light on the issue of preemption.

In *Cipollone*, the plaintiff sued a cigarette manufacturer for wrongful death of his mother. He claimed that the manufacturer breached express warranties contained in advertising, failed to warn consumers about the hazards of cigarette smoking, fraudulently misrepresented the hazards of smoking, and conspired to withhold from the public medical information about smoking. — U.S. at ——, 112 S.Ct. at 2613. The Court considered whether these claims could survive the Federal Cigarette Labeling and Advertising Act of 1965,[12] which required a specific and conspicuous health warning on all cigarette packages sold in this country. The question at issue was essentially that presented in this case: Did that Act's preemption provision—barring states from imposing other warning requirements related to advertising or promoting cigarettes—bar the plaintiff's common-law tort claims?

The Supreme Court partly reversed the lower court's ruling that the Labeling Act preempted the state law claims. *Id.* at ——, 112 S.Ct. at 2625. Finding that the preemp-

tive scope of the Labeling Act is governed entirely by its express language, the Court held that the preemption provision only prohibits state lawmakers from mandating particular warning labels. *Cipollone* changed federal preemption analysis by limiting the preemptive reach of a federal statute to its express terms:

> When Congress has considered the issue of preemption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with respect to state authority, there is no need to infer congressional intent to pre-empt state laws from the substantive provisions.... Therefore, we need only identify the domain expressly pre-empted by each of these sections.

*Id.* at ——, 112 S.Ct. at 2618 (citations and quotes omitted). *Cipollone* thus limited preemption analysis to the express statutory language by holding that a correlative federal regulatory requirement "does not by its own effect foreclose additional obligations imposed under state law." *Id.* In short, courts should avoid debating implied preemption if the text of the statute addresses preemption and thus reliably identifies congressional intent.

In the wake of *Cipollone*, courts have narrowed their evaluation of a statute's preemptive reach. Almost all the federal circuits have addressed federal preemption since *Cipollone* and now consider expression of preemption in a statute's text the "reliable indicium of congressional intent," no longer divining implied preemption. *See Myrick v. Fruehauf Corp.*, 13 F.3d 1516, 1522 (11th Cir.1994) (citing cases[13] following *Cipollone*'s instruction that preemption analysis should be limited to the "domain expressly pre-empted by each of those sections"), *cert.*

---

**12.** This act was succeeded by the Public Health Cigarette Smoking Act of 1969, 15 U.S.C. §§ 1331–1340.

**13.** *Draper v. Chiapuzio*, 9 F.3d 1391 (9th Cir. 1993); *Worm v. American Cyanamid Co.*, 5 F.3d 744, 747 (4th Cir.1993); *Kinley Corp. v. Iowa Utils. Bd.*, 999 F.2d 354, 358 (8th Cir.1993); *Toy Mfrs. of Am., Inc. v. Blumenthal*, 986 F.2d 615, 623 (2d Cir.1992); *Cleveland v. Piper Aircraft Corp.*, 985 F.2d 1438, 1447 (10th Cir.), *cert. de-*

*nied,* —— U.S. ——, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993); *Stamps v. Collagen Corp.*, 984 F.2d 1416, 1420 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 86, 126 L.Ed.2d 54 (1993); *American Agric. Movement, Inc. v. Board of Trade*, 977 F.2d 1147, 1154 (7th Cir.1992); *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 823 (1st Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 974, 122 L.Ed.2d 129 (1993).

*granted,* —— U.S. ——, 115 S.Ct. 306, 130 L.Ed.2d 218 (1994).

Significantly, since *Cipollone,* at least one circuit court has reevaluated its previous holding. In *Taylor,* a pre-*Cipollone* case acknowledging no express common-law pre-emption, the Eleventh Circuit held that a common-law tort claim based on a defect in a design complying with the Safety Act's standards was impliedly barred. After *Cipollone* a different panel of the same court ruled to the contrary in *Myrick,* a case concerning a liability claim against truck and trailer manufacturers for failing to install anti-lock brakes. 13 F.3d at 1521–22. Finding the plaintiffs' tort claims not expressly preempted by the Safety Act's preemption clause and expressly protected by the savings clause, *Myrick* partly overruled *Taylor* by following "*Cipollone*'s clear instruction that when there is an express pre-emption provision we should not consider implied pre-emption...." *Id.* at 1522. At least one state appellate court has followed *Myrick*'s lead by finding no preemption of an airbag liability claim. *Loulos v. Dick Smith Ford Inc.,* 882 S.W.2d 149 (Mo.Ct.App.1994), *transfer denied* (the savings clause is a reliable indicium of congressional intent to save a common-law airbag claim).

Not all post-*Cipollone* no-airbag cases agree that these claims survive. One federal district court stated that:

> The mere presence of express preemption language does not necessarily prohibit an implied preemption analysis under the *Cipollone* rule.... A court may ... search a statute for implied preemptive intent if that statute's express language fails to provide a "reliable indicium" of the legislature's preemptive wishes.

*Gills,* 829 F.Supp. at 897–98 (citations omitted). Finding that a common-law claim could have a conflicting regulatory effect if it would establish a state safety standard different from the federal standard but covering the same aspect of performance, the court granted partial summary judgment for the defendant carmaker on the grounds that the Safe-

ty Act had impliedly preempted the airbag claim because such a claim would interfere with the manufacturer's approved options. *Id.* at 899. The court, however, distinguished airbag claims from common-law claims "that a safety device [presumably including a seatbelt assembly], though in compliance with minimum federal standards, failed to meet higher performance requirements." *Id.* Although a claim based on the absence of an airbag would effectively reduce a carmaker's choice of Standard 208 options, a claim based on a defective though federally approved design would not. The latter claim would force the carmaker to either satisfy a higher standard for its system design or face the risk of damages claims, a result not necessarily in conflict with the inherent flexibility of the Safety Act.[14]

Another district court has concluded that the preemption clause "*expressly* preempt[s] all state tort claims that are 'applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard.'" *Montag v. Honda Motor Co., Ltd.,* 856 F.Supp. 574, 577 (D.Colo.1994) (emphasis added). On the other hand, the court held that the "savings clause does not express any specific congressional intent to preserve state common law actions" that effectively circumvent the preemption clause. *Id.* With all due respect, the district judge seems to suggest that Congress could not have meant what it said when in the savings clause it stated that compliance would "not exempt any persons from any liability under common law."

Like those pre-*Cipollone* opinions that ignored the explicit language of federal statutes while searching for unarticulated congressional motives, we believe the district court analyses in *Gills* and *Montag* are incorrect. *Cipollone* commands courts to follow a textual path in ascertaining a statute's meaning, making it unnecessary either to search for unarticulated legislative intent or engage in a balancing process that may result in a conclusion of implied preemption. As we read Justice Stevens' words in *Cipollone,* in

---

**14.** Presumably *Gills'* rationale would not recognize preemption of the claim asserted in the present case.

which Congress addressed the preemption question, as in the Safety Act, preemptive reach is determined not by a search for unexpressed congressional intent but by the words of the text itself. Thus, the text provides "the reliable indicium of congressional intent" to preempt state authority. *Cipollone,* — U.S. at ——, 112 S.Ct. at 2618. The application of that rule ends the "need to infer congressional intent to preempt state laws from the [other] substantive provision[s]" of the legislation. *Id.; CSX Transp., Inc. v. Easterwood,* — U.S. ——, ——, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993) ("If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent."). Thus, when the statute addresses preemption, its text defines preemptive reach and "implies that matters beyond that reach are not preempted." *Cipollone,* — U.S. at ——, 112 S.Ct. at 2618.

For what it is worth, we believe that this rule is by far the best policy. If a legislative body wishes to preempt, it knows the language that will accomplish that result. *Taylor,* 875 F.2d at 824.[15] "If the legislature seeks to preempt a cause of action or to deprive the courts of jurisdiction, the law's text ... should say so explicitly." *Hayes,* 178 Ariz. at 273, 872 P.2d at 677. Such a rule transfers the decision about preemption and its reach from the post-hoc speculation of lawyers to the forum where it should be argued: the legislature, where the competing interests may be reconciled *before* the statute is passed. *Id.*

### D. Resolution

■ With the *Cipollone* rule in mind, we turn to the preemption issue before us. We find the Safety Act's text clear enough. The preemption clause itself indicates that Congress considered the issue of preemption. The text expressly precludes any state from establishing, or prescribing, a safety standard not identical to the same aspect of performance targeted by a federal standard. 15 U.S.C. § 1392(d), now 49 U.S.C. § 30103(b). A state can set a standard neither more nor less exacting. Arizona, of course, has not set any standard, let alone one that conflicts with the federal standard. Standing alone, § 1392(d) might not show a legislative intent to preempt only *state-enacted* regulatory safety standards. Arguably, it could have been construed to prohibit *any* form of state authority from interfering with the options permitted by federal law.[16]

Congress' inclusion of the savings clause unquestionably removes any doubt. The text of the savings clause explicitly shelters common-law claims from preemption, expansively providing that compliance with federal regulations "does not exempt [one] from *any* liability under common law." 15 U.S.C. § 1397(k) (codified as amended at 49 U.S.C. § 30103(e) (emphasis added). We find these words a reliably clear congressional mandate. The inescapable conclusion is that Congress considered the preemption issue, addressed it in the text of the legislation, and rejected preemption of state law tort claims like the one in this case. Finding preemption of this claim would violate the command of *Cipollone. See* — U.S. at ——, 112 S.Ct. at 2618.

Thus, this case does not tempt us to speculate on unstated congressional intent or the

---

**15.** As noted in *Taylor,* 875 F.2d at 824, examples of federal acts in which common-law claims are expressly preempted include the Domestic Housing and International Recovery and Financial Stability Act, 12 U.S.C. § 1715z–17(d), –18(e) (1989) (preempting any "State constitution, statute, court decree, common law, rule, or public policy"); Copyright Act of 1976, 17 U.S.C. § 301(a) (1982) (preempting rights "under the common law or statutes of any State," with common-law exceptions noted in other subsections); Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1144(a), (c)(1) (1985) (preempting "any and all State law," including "decisions, rules, regulations, or other State action having the effect of law").

**16.** Even considering only the preemption clause, we do not believe such an analysis could survive *Cipollone.* Our reading of the preemption clause leads us to conclude that the legislative intent was to prohibit states from enacting any regulation that would conflict with the federal standards. It does not expressly preempt state courts from awarding tort damages for unreasonably defective designs, and therefore it would not preempt common-law tort claims.

Safety Act's implied preemptive reach. We conclude that common-law damage judgments are not preempted because (1) the text of the preemption clause addresses regulatory standards and does not reach or include common-law tort claims, and (2) the savings clause explicitly manifests a congressional intent to preserve common-law tort claims.[17] In addition, speculating that § 1392(d) might preclude conflicting common-law standards would effectively nullify the mandate that the Safety Act preempts no common-law liability. *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955) (courts have a duty to give effect to every clause in a statute, if possible).

Thus, our analysis of preemption by the Safety Act ends with a reading of the text of the preemption clause and its companion, the savings clause. The two clauses act harmoniously to forbid states from enacting conflicting standards while allowing common-law tort actions.[18] We believe *Cipollone* requires this result and are secure in the knowledge that our construction of this federal statute is not the last word.

### CONCLUSION

The Safety Act does not preempt Plaintiff's action for defective design of a federally approved restraint system. The Safety Act's savings clause expresses Congress' intent to allow state common-law claims against automobile manufacturers whose safety restraint systems comply with federal minimum performance standards but are unreasonably dangerous to consumers. Thus, the trial court erred in granting VW's motion for partial summary judgment. We vacate the order granting the motion and remand this case for further proceedings consistent with this opinion.

MOELLER, V.C.J., and CORCORAN, ZLAKET and MARTONE, JJ., concur.

---

17. We reject the proposition that because the preemption clause makes no explicit reference to common-law claims, we are free to conclude that Congress meant to preempt them. On the contrary, the absence of a reference to common-law claims indicates that Congress did *not* intend preemption. We acknowledge that past decisions by the Supreme Court "have recognized the phrase 'state law' to include common law as well as statutes and regulations." *Cipollone,* —— U.S. at ——, 112 S.Ct. at 2620. But *Cipollone* admits that "the presumption against preemption might give good reason to construe the phrase 'state law' in a pre-emption provision more narrowly than an identical phrase in another context." *Id.* at ——, 112 S.Ct. at 2620–21. We view the savings provision in the Safety Act as another good reason for construing the phrase narrowly in this case.

18. Nor is such a result so unusual that one must conclude Congress could not have intended it. Indeed, it is the general rule of tort law that a design defect action is not precluded merely because the manufacturer complied with regulations. *See* W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 36, at 233 (5th ed. 1984) ("While compliance with a statutory standard is evidence of due care, it is not conclusive on the issue.").