917 P.2d 238

**Amparo HERNANDEZ–GOMEZ, Petitioner,**

v.

**Hon. John S. LEONARDO, Judge of the Superior Court of the State of Arizona, in and for the County of Pima, Respondent,**

**VOLKSWAGEN OF AMERICA, INC., a New Jersey Corporation, and Volkswagenwerk Aktiengesellschaft, a Foreign Corporation, Real Parties in Interest.**

**No. CV–93–0202–PR**

Supreme Court of Arizona, En Banc.

May 14, 1996.

Superior Court, was authorized to participate in the disposition of this matter by the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. art. 6, § 3.

Haralson, Kinerk & Morey, P.C. by Gregory G. Wasley, D. Dale Haralson, Tucson, for Petitioner.

Fennemore Craig, P.C. by Timothy Berg, William T. Burghart, Joseph P. Mikitish, Phoenix, for Real Parties in Interest.

FELDMAN, Chief Justice.

Amparo Hernandez–Gomez (Plaintiff) was rendered quadriplegic on November 6, 1988, when the 1981 Volkswagen Rabbit in which Plaintiff was a passenger veered off the road and flipped over, smashing her head and shoulders against the car's roof. Plaintiff alleges that the *design* of the Rabbit's occupant restraint system failed to provide adequate protection in foreseeable rollover accidents. The restraint system for the car's right front passenger seat consisted of a shoulder belt that automatically moved into place diagonally across the chest when the door was shut, a knee bolster, and a seat designed to prevent the occupant from submarining under the dashboard in a head-on collision. Plaintiff claims that the lack of a manual lap belt made the car's design defective and unreasonably dangerous to its occupants, thereby enhancing her injuries.

The trial court granted Volkswagen's motion for partial summary judgment on the ground that the Rabbit's passive restraint system complied with FMVSS 208 (Standard 208), a federal motor vehicle and motor vehicle equipment *performance* standard, and that Plaintiff's claim was therefore preempted by the Safety Act. Plaintiff sought relief from the trial court's order by bringing a special action in the court of appeals, which declined jurisdiction. This court then granted review to answer the fundamental question of whether an automobile manufacturer can be liable under state tort law for a product design defect when that design is permitted by the Safety Act's standards.

*Hernandez–Gomez v. Leonardo,* 180 Ariz. 297, 298, 884 P.2d 183, 184 (1994) (*Hernandez–Gomez I*). Relying on the United States Supreme Court's decision in *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), we answered this question in the affirmative.

The United States Supreme Court granted Volkswagen's petition for certiorari, vacated our opinion, and remanded the case for reconsideration in light of the Court's intervening decision in *Freightliner Corp. v. Myrick,* —— U.S. ——, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995). *Volkswagen of America, Inc. v. Hernandez–Gomez,* —— U.S. ——, 115 S.Ct. 1819, 131 L.Ed.2d 742 (1995) (*Hernandez–Gomez II*).

On remand, we requested additional briefing from counsel and heard argument on the question of whether our holding in *Hernandez–Gomez I* could stand in light of *Myrick.* Accordingly, we begin with a summary of our previous opinion and an analysis of *Myrick.*

## DISCUSSION

### A. *Hernandez–Gomez I*

In *Cipollone,* the Supreme Court stated:

> If Congress has considered the issue of preemption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with respect to state authority, ... there is no need to infer congressional intent to preempt state laws. ...

505 U.S. at 517, 112 S.Ct. at 2618 (citations and internal quotations omitted). Relying primarily on this principle, we determined in *Hernandez–Gomez I* that federal preemption analysis was limited to ascertaining a federal statute's express preemptive reach and held:

1. Our analysis of preemption by the Safety Act ends with a reading of the text of the preemption clause and its companion savings clause. *Hernandez–Gomez I,* 180 Ariz. at 305, 884 P.2d at 191.

2. The two clauses work together to forbid states from enacting conflicting regulatory standards but allow common-law tort actions. *Id.*

We therefore concluded that Plaintiff's action for defective design of the restraint system was not preempted by the express terms of the Safety Act even though that type of design was permitted by Standard 208. Because we believed that the reach of the statute's preemption clause was limited to the text of that clause and the savings clause, we did not address the issue of implied preemption. *See id.* at 304, 884 P.2d at 190 (citing *Cipollone,* 505 U.S. at 517, 112 S.Ct. at 2618).

### B. *Freightliner Corp. v. Myrick*

■ *Myrick* modifies our reading of *Cipollone.* After *Myrick, Cipollone* appears to stand for the proposition that the limited reach of an express preemption provision does not preclude a finding of implied preemption, although it does raise a rebuttable presumption that a claim is not preempted. *See Sofamor Danek Group, Inc. v. Gaus,* 61 F.3d 929, 935 (D.C.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 910, 133 L.Ed.2d 841 (1996) ("inference discussed in *Cipollone* is rebuttable") (citing *Myrick*). As *Myrick* explains, the presence of an explicit statement limiting Congress' preemptive intent does "not obviate the need for courts to examine the [implied] preemptive effects of a statute." *Myrick,* —— U.S. at ——, 115 S.Ct. at 1488. *See Lohr v. Medtronic, Inc.,* 56 F.3d 1335, 1341 n. 5 (11th Cir.1995), *cert. granted,* —— U.S. ——, 116 S.Ct. 806, 133 L.Ed.2d 752 (1996) ("the Supreme Court recently explained that implied preemption is sometimes appropriate despite the existence of [a limited] preemption provision") (citing *Myrick*). Nonetheless, the text of a preemptive clause is still of great importance. Thus, before we can determine whether a particular state common-law claim is preempted by federal law, we must first look to the language of the statute to ascertain its explicit preemptive intent; under *Cipollone,* the explicit "pre-emptive scope of the [statute is] governed by [its] language." *Myrick,* —— U.S. at ——, 115 S.Ct. at 1487.

### C. Express preemption

Under *Myrick,* we must determine 1) whether Congress considered the issue of

preemption when enacting the Safety Act; 2) whether it included in the enacted legislation a provision explicitly addressing that issue; and 3) whether any such provision provides a reliable indicium of congressional intent with respect to state authority.

### 1. Has Congress considered the issue of preemption and its extent?

■ Review of the Safety Act's legislative history clearly shows that Congress considered the issue of preemption. The Senate Report states:

Federal minimum safety standards need not be interpreted as restricting State common law standards of care. Compliance with such standards would thus not necessarily shield any person from product liability at common law. . . . State standards are preempted only if they differ from Federal standards applicable to the particular aspect of the vehicle or item of vehicle equipment.

S.Rep. No. 1301, 89th Cong., 2d Sess. (1966), *reprinted in* 1966 U.S.C.C.A.N. 2709, 2720. The bill's sponsor, Senator Magnuson, further remarked:

Compliance with Federal standards would not necessarily shield any person from broad liability at the common law. The common law on product liability still remains as it was.

112 Cong.Rec. 14230 (1966). The House committee report also noted:

*Common law liability.*—Section 108(c) of the reported bill provides that compliance with any Federal motor vehicle safety standard does not exempt a person from any liability under common law.

It is intended, and this subsection specifically establishes, that compliance with safety standards is not to be a defense or otherwise to affect the rights of parties under common law particularly those relating to warranty, contract, and *tort* liability. [Even those persons exempt from compliance with these safety standards] under paragraph (2) of subsection (b) of this section will not [be] excuse[d] . . . from otherwise applicable legal liability.

H.Rep. No. 1776, 89th Cong., 2d Sess. 24 (1966) (emphasis added).

■ We are mindful of the fact that the expressed intent of several congressmen is not necessarily determinative, and that these "unenacted approvals, beliefs, and desires are not laws." *See Puerto Rico Dept. of Consumer Affairs v. Isla Petroleum Corp.,* 485 U.S. 495, 501, 108 S.Ct. 1350, 1354, 99 L.Ed.2d 582 (1988). We believe, however, that when the sponsors of a bill and the very committees considering that bill tell Congress and the public what they intended to accomplish with a specific provision of that bill, such expressed intentions can be useful to clarify any ambiguity in the meaning of the enacted legislation.

### 2. Did Congress include in the enacted legislation a provision explicitly addressing the extent of preemption?

Section 1392(d) preempts, "with respect to any motor vehicle or item of motor vehicle equipment any [State] safety standard applicable to the *same aspect of performance* of such vehicle or item of equipment *which is not identical* to the Federal standard." 15 U.S.C. § 1392(d) (emphasis added). Additionally, Congress enacted 15 U.S.C. § 1397(k), the Safety Act's savings clause, which provides that "[c]ompliance with any Federal motor vehicle safety standard . . . does not exempt any person from any liability under common law." Hence, Congress has not only considered the issue of preemption but also has included provisions explicitly limiting its extent.

### 3. Do the provisions addressing preemption provide a reliable indicium of congressional intent?

■ The extensive legislative history addressing the issue of preemption, the clearly articulated and explicit provisions in both the savings and preemption clauses of the Safety Act, and Congress' inclusion of the term "common law" in the savings clause provide an uncommonly reliable indication of Congress' intent with respect to state authority: "The Act's preemption clause applies *only* '[w]henever a Federal motor vehicle safety standard . . . is in effect' with respect to 'the

same aspect of *performance*' regulated by a state standard." *Myrick*, —— U.S. at ——, 115 S.Ct. at 1487 (emphasis added). Here, as with the anti-lock braking system considered in *Myrick*, the provision of Standard 208 (S4.1.2.2(b))—compliance with which Volkswagen alleges preempts Plaintiff's claim—does not address the performance aspect at issue: brakes in *Myrick* and rollover protection in the present case. It is of no import that manufacturers who chose S4.1.2.1(c)(1) may have to satisfy the rollover crash protection requirements of S5.3 because Volkswagen neither chose that "First Option" nor demonstrated that it preempted Plaintiff's claim. *See* concurrence at —— ——. Accordingly, Plaintiff's claim is not expressly preempted. As noted above, *Myrick* indicates that under these circumstances, there is a rebuttable presumption that Congress did not intend for preemption to be implied.

· It is possible, of course, that the presence of the savings clause, 15 U.S.C. § 1397(k), "prohibits a manufacturer from using federal safety standards to immunize itself from state common-law liability." *Myrick*, —— U.S. at ——, 115 S.Ct. at 1487 n. 3. On this point we agree with the concurrence. We so held in *Hernandez–Gomez I*, and ordinarily we would stop at this point. 180 Ariz. at 305, 884 P.2d at 191.

However, the Court did not have to address the significance of the savings clause in *Myrick* because there was *no* standard in effect dealing with the braking issue in that case. Without a standard there can be no preemption—express or implied. The text of the footnote supports this position:

> *Because no federal safety standard exists,* we need not reach respondents' argument that the term "standard" in 15 U.S.C. § 1392(d) preempts only state statutes and regulations, but not common law. We also need not address respondents' claim that the savings clause, § 1397(k), does not permit a manufacturer to use a federal safety standard to immunize itself from state common-law liability.

*Myrick*, —— U.S. at ——, 115 S.Ct. at 1487 n. 3 (emphasis added). Thus, although we agree that it is possible the presence of a savings clause categorically precludes preemption, the Court did not address the issue and we cannot tell from the language in *Myrick* that the Court would necessarily agree with such an interpretation.

■ It is clear to us, however, that at the very least *Myrick* stands for the proposition that common-law claims that expressly and directly conflict with the text of the standard are preempted by the preemption clause; common-law claims that do not expressly conflict may still be preempted if they violate one of the articulated rules for implied preemption; common-law claims that are neither expressly nor impliedly preempted are saved.

Despite the existence of the savings clause, therefore, we proceed with the implied preemption analysis followed by the United States Supreme Court in *Myrick*. We do so because this case has been in our judicial system since 1990, has now been before this court twice and before the United States Supreme Court once. Rather than attempt to dispose of the case solely by resolving an issue pertaining to the construction of a federal statute when that issue has been left open by the United States Supreme Court, we take the jurisprudentially safer course and proceed with an implied preemption analysis. *See Wilson v. Pleasant*, 660 N.E.2d 327, 336–37 (Ind.1995).

### D. Implied preemption

■ Even if § 1392(d) does not expressly extinguish Plaintiff's state tort claim, the Supreme Court has recognized that federal statutes can, in some circumstances, implicitly override state law. *See Myrick*, —— U.S. at ——, 115 S.Ct. at 1487. In the absence of explicit preemption, implied preemption can still exist when:

1. The "scope of a statute indicates that Congress intended federal law to occupy the field exclusively";

2. "[S]tate law is in actual conflict with federal law";

3. It is "impossible ... to comply with both state and federal requirements"; or

4. State law is an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Myrick,* —— U.S. at ——, 115 S.Ct. at 1487 (citations omitted).

Thus, to determine whether a state common-law claim is impliedly preempted under the Safety Act, we must now go beyond statutory language and, as in *Myrick,* examine the safety standard at issue, Standard 208. We do so to determine the preclusive effects of the Safety Act in light of the regulatory scope of Standard 208. Only then can we determine if Plaintiff's state common-law claim is impliedly preempted by the Safety Act.

***1. Does the regulatory scope of Standard 208 indicate that Congress intended to occupy the field exclusively?***

 We answer this question in the negative. The statutory scheme authorizing promulgation of Standard 208[1] directed the Secretary of Transportation to establish "appropriate Federal motor vehicle safety standards." 15 U.S.C. § 1392(a). These standards were further defined as *"minimum standard[s] for* ... motor vehicle equipment *performance."* 15 U.S.C. § 1391(2) (emphasis added). The first sentence in the section of the Senate Report concerning the scope of this statute states that the "critical definitions which delimit the scope of the bill are those of 'motor vehicle' and 'motor vehicle safety.' " S.Rep. No. 1301, 89th Cong., 2d Sess. (1966), *reprinted in* 1966 U.S.C.C.A.N. 2709, 2713. Initially, "motor vehicle safety" was defined as "the *performance* of vehicles or motor vehicle equipment in such a manner that the public is protected against unreasonable risk of accident occurring as the result of the design or construction of motor vehicles." *Id.* (emphasis added). Additionally, that section of the Senate Report describing the nature of the standards noted:

Unlike the General Services Administrations's procurement standards, which are primarily design specifications, [these standards] are expected to be *performance standards,* specifying the required *mini-*

*mum safe performance of vehicles but not the manner in which the manufacturer is to achieve* the specified performance.... The Secretary would thus be concerned with the measurable performance of a braking system, *but not its design details.*

S.Rep. No. 1301, 89th Cong., 2d Sess. (1966), *reprinted in* 1966 U.S.C.C.A.N. 2709, 2713–14 (emphasis added). Indeed, in reviewing a claim that failure to include an anti-lock braking system was a negligent design, the Supreme Court noted that the regulation alleged to preempt the claim, had it been in effect, would have required "stopping distances" measured in terms of feet. *See Myrick,* —— U.S. at ——, 115 S.Ct. at 1486–87. Stopping distances, measured in the objective terms of feet, are clearly an aspect of performance, not design.

Thus, from the beginning it is seen that the minimum standards were intended to apply to performance characteristics of the vehicle and equipment installed in the vehicle, not to what equipment must, or could be, installed. *See Perry v. Mercedes Benz of North America, Inc.,* 957 F.2d 1257, 1265 (5th Cir.1992) ("Once the manufacturer chooses an option that includes an air bag system, Standard 208 S5–S6 merely set forth the *minimum* performance requirements for that system.") (emphasis in original); *Wood v. General Motors Corp.,* 865 F.2d 395, 402 n. 9 (1st Cir.1987) ("the Safety Act authorizes the promulgation of performance standards, rather than design standards...."), *cert. denied,* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 782 (1990).

The individual provisions of Standard 208 are also framed as performance requirements, not equipment or design requirements. For example, S1 and S2, under Standard 208, set out the scope and purpose of Standard 208.

**S1. Scope.** [Standard 208] specifies performance requirements for the protection of vehicle occupants in crashes.

**S2. Purpose.** The purpose of [Standard 208] is to [reduce death and injuries to vehicle occupants] by specifying vehicle

1. 49 C.F.R. 571.208, Standard 208 (1984).

crashworthiness requirements in terms of forces and accelerations measured, on anthropomorphic dummies in test crashes, and by specifying equipment requirements for active and passive restraint systems. 49 C.F.R. 571.208, Standard 208 (1984). It is obvious that the substandards under Standard 208 do not concern the design of equipment to be installed but, rather, performance of the equipment that is installed. Standard 208 then delineates options available to manufacturers for meeting these minimum performance requirements:

> **S4.1.2** [ ] Each passenger car manufactured on or after September 1, 1973, and before September 1, 1986, shall meet the requirements of S4.1.2.1, S4.1.2.2 or S4.1.2.3.

49 C.F.R. 571.208, S4.1.2.

Under S4.1.2.1, each front outboard seat must meet "the *frontal* crash protection requirements of S5.1 by means that require no action by vehicle occupants." S4.1.2.1(a) (emphasis added). Volkswagen chose **S4.1.2.2(b)**, which requires:

> each front outboard designated seating position [to] meet the *frontal* crash protection requirements of S5.1, in a perpendicular impact, by means that *require no action by vehicle occupants.*[2]

S4.1.2.2(b) (emphasis added). Like all the options, the one Volkswagen chose applies only to the *performance* requirements of a restraint system in a *frontal* crash. It does not mandate a particular design or any specific equipment. However, under S4.1.2.2(b), frontal crash protection cannot be accomplished with the aid of manual devices. Thus, under this option the required protection from frontal crashes cannot be achieved through use of a manual lap belt; only passive restraints can be used to provide frontal crash protection. Additionally, all options listed in S4.1.2 must meet the S5.1 standard:

> **S5.1 Frontal barrier crash.** When the vehicle traveling longitudinally forward at any speed up to and including 30 mph, impacts a fixed collision barrier that is

perpendicular to the line of travel of the vehicle, or at any angle up to 30 degrees in either direction from the perpendicular to the line of travel of the vehicle, under the applicable conditions of S8, with anthropomorphic test devices [ (crash dummies) ] at each designated seating position described in (a) or (b) for which a barrier crash test is required under S4., it shall meet the injury criteria of S6.

49 C.F.R. 571.208, S5.1. The criteria of S6 set frontal crash injury limits, in terms of forces and accelerations measured on crash dummies, that may be inflicted in a crash. The criteria of S8 define general test conditions such as surface conditions, dummy placement, vehicle load, and construction of the impact barrier.

Thus, the preemptive reach of 15 U.S.C. § 1392(d), defined by Standard 208's limited regulatory scope, is not a comprehensive regulation that occupies the entire field. Rather, it covers only crashworthiness standards applicable to particular aspects of vehicle or vehicle equipment performance, in terms of forces and accelerations, measured on anthropomorphic dummies in test crashes. It does not mandate a particular design, only performance of the design chosen, and is applicable only to the *front-end* crash protection aspect of performance.

### 2. Is state law in actual conflict with federal law?

As noted in *Hernandez–Gomez I*, Arizona has not promulgated any regulations. 180 Ariz. at 304, 884 P.2d at 190. Thus, the question is whether imposition of common-law liability creates a state standard that conflicts with federal law. Resolution of this question is, by necessity, fact specific. Because Congress has not occupied the entire field, there may be common-law claims that do not implicate the federal law at all. On the other hand, Congress has occupied a part of the field; thus there is the possibility of conflict between federal law and a state common-law claim. Accordingly, resolution of

---

**2.** The only difference between S4.1.2.1(a) and S4.1.2.2(b) is that the latter includes the phrase "in a perpendicular impact." Just what the distinction is cannot be found in the Standard, but

apparently the phrase is used to define "frontal" geometrically. In any event, the word "perpendicular" is subsumed by the more precise performance requirement of S5.1.

this case turns on whether the specific facts and theory advanced by Plaintiff conflict with the Safety Act.

Plaintiff argues that the vehicle was dangerously defective because it did not include a manual lap belt to protect against injuries received in a rollover accident. Volkswagen claims that Standard 208 gives it the option to install fully passive, automatic two-point safety belts with no manually activated lap belts. While this is true, the option Volkswagen chose—S4.1.2.2(b)—applies only to the performance requirement of the restraint system in a frontal crash. Although, as Volkswagen points out, frontal crash protection cannot be accomplished through manual lap belts, Volkswagen's characterization of Standard 208 is incomplete. It would be most correct to state that although the option Volkswagen chose permitted it to install any fully passive device that met the frontal crash performance protection requirements of S5.1 in a perpendicular impact, it did not prohibit additional, manually-activated or automatic devices to provide protection in other types of crashes, including rollovers.

Thus, Volkswagen could argue that a state common-law tort claim, which alleges that a defective design failed to protect occupants in front-end accidents, is preempted if federal regulatory requirements for performance in front-end accidents were met. Volkswagen cannot, however, make that preemption claim with regard to rollover accidents because the federal standard it chose did not address design or performance requirements for that type of accident. Rather, the standard covered performance in front-end accidents. Nothing in the federal regulations prevented Volkswagen from including additional design or equipment, such as manual belts, to protect from injury in other types of foreseeable accidents.

The conclusion that Volkswagen could have chosen manual lap belts for a purpose other than providing frontal crash protection is supported by the record between Volkswagen and the National Highway Transportation Safety Administration (NHTSA). In 1974, a year before Volkswagen introduced its two-point, passive design, it wrote to NHTSA asking if it could install manual lap belts *with* its already approved two-point passive shoulder belt. NHTSA wrote back stating:

> A vehicle which satisfies Standard No. 208, *Occupant crash protection,* may be equipped, at the option of the manufacturer with additional safety belts which conform to Standard No. 209, *Seat belt assemblies.*

NHTSA reply letter to Volkswagen, June 28, 1974. Thus, even though S4.1.2.2(b) expressly prohibits the use of manual devices to achieve the required front-end crash protection, nothing prevented the use of manual devices for protection in other types of crashes. Therefore, even if Standard 208 is construed to be an equipment or design standard, there is, at least according to the NHTSA, no conflict between S4.1.2.2(b) and the inclusion of manual devices for protection in other types of crashes. Thus, there is no conflict created by the imposition of tort liability for failing to include manual devices for protection in other types of crashes. Accordingly, if Plaintiff were asserting that the defect was failure to provide manual lap belts for protection in a frontal crash, the claim would be preempted by implication because it directly contradicts an express prohibition in S4.1.2.2(b). Similarly, if Plaintiff claimed the manufacturer should not have included *any* occupant restraints, the claim would fail because federal law specifically requires some type of occupant restraint system. *See Wilson,* 660 N.E.2d at 337.

To summarize the technical aspects: Plaintiff claims that a manual lap belt should have been installed for protection in rollover, not frontal crashes. However, S4.1.2.2(b), upon which Volkswagen relies, relates only to minimum performance standards in frontal crashes; it does not prohibit manual lap belts or other equipment for protection in other types of crashes. Not only are frontal, side, and rollover protection totally different performance aspects, but Volkswagen also had the express permission of the NHTSA to install manual lap belts. Therefore, no conflict will arise if Volkswagen is found liable on Plaintiff's theory. Thus, Plaintiff's claim is not impliedly preempted under this conflict theory.

### 3. Is it impossible to comply with both state and federal law?

Whether simultaneous compliance with state and federal law is impossible also depends on the particular case. Implied preemption might exist if a state law required Volkswagen to include manual lap belts to protect against frontal impact because it would be impossible for Volkswagen to have complied when federal law prohibited use of manual devices for such a purpose. There are undoubtedly other hypothetical situations that could create such a conundrum. In Arizona, there is no such requirement. Furthermore, in this case it was not impossible for Volkswagen to comply with the frontal crash performance standard requiring a fully passive system and still install a lap belt to provide protection in rollover accidents. Therefore, it is possible for Volkswagen to both comply with federal law and be found liable in tort under the theory asserted by Plaintiff.

### 4. Does state law interfere with Congress' chosen methods or obstruct federal law from accomplishing Congress' objectives?

■ To answer this question we must first ascertain Congress' objectives and its chosen method of accomplishing those objectives. Fortunately, these are set out clearly in the statute, the standards, and the legislative history. The declared general purpose of the Safety Act is "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." 15 U.S.C. § 1381. The general purpose of Standard 208 is "to reduce the number of deaths of vehicle occupants, and the severity of injuries...." 49 C.F.R. 571.208 S2. Review of the legislative history reveals that Congress had other, more specific objectives in mind as well. The Senate Report declared that

> this legislation reflects the faith that the restrained and responsible exercise of Federal authority can channel the creative energies and vast technology of the automobile industry into a vigorous and competitive effort to improve the safety of vehicles.

S.Rep. No. 1301, 89th Cong., 2d Sess. (1966), reprinted in 1966 U.S.C.C.A.N. 2709. Thus, it was also Congress' objective to stimulate competition and innovation beyond that required in the standards.

Volkswagen argues that imposing liability for failure to include a lap belt would remove an element of choice authorized by S4.1.2.2(b) and frustrates the regulatory scheme by punishing it for doing what the federal act authorized: including a fully passive restraint system to meet the performance requirements for frontal collisions. At least one pre-Cipollone/Myrick court has been persuaded by this argument. See Taylor v. General Motors Corp., 875 F.2d 816 (11th Cir.1989), cert. denied, 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990). Other, post-Cipollone/Myrick cases, however, have reached the opposite conclusion. See Wilson, 660 N.E.2d 327; Tebbetts v. Ford Motor Co., 140 N.H. 203, 665 A.2d 345 (1995), cert. denied, —— U.S. ——, 116 S.Ct. 773, 133 L.Ed.2d 726 (1996). The authority for Taylor's proposition comes from Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 318, 101 S.Ct. 1124, 1131, 67 L.Ed.2d 258 (1981) (noting that under the principles of implied preemption, "[it would be inconsistent with federal policy] 'if local authorities retained the power to decide' whether the [railway] could do what the [federal law] authorized them to do"), quoting Chicago v. Atchison, T. & S.F.R. Co., 357 U.S. 77, 87, 78 S.Ct. 1063, 1069, 2 L.Ed.2d 1174 (1958).

In Kalo, the Court was referring to a local ordinance requiring railways to obtain a municipal permit to transfer passengers when the federal act in question had already given the railway express permission to do so. Requiring local permission to do something federal law already explicitly authorizes is vastly different from imposing liability on a business for failing to do something the statute does not prohibit and the business had express permission to do.

Thus, imposing common-law liability for failure to include manual lap belts for protection in rollover accidents does not take away a choice. In addition, it would neither stifle innovation and competition nor thwart the

purpose of reducing death and injury due to traffic accidents. Rather, the effect of common-law liability here would be to compensate Plaintiff for injuries allegedly caused by the manufacturer's choice *not* to do something allowed under the standards: install manual lap belts to provide rollover protection. Thus, there is no obstruction of Congress' objectives.

Finally, it must be determined if liability under common law will interfere with Congress' chosen method of accomplishing its objectives. Here too the statute and standards speak directly to the chosen method. The statute's declared purpose of reducing death and injuries is to be accomplished by "establish[ing] motor vehicle safety standards for motor vehicles and equipment." 15 U.S.C. § 1381. These standards are defined as *"minimum* standard[s] for motor vehicle *performance,* or motor vehicle equipment *performance."* 15 U.S.C. § 1391(2) (emphasis added). The standards define the methodology more specifically in stating that the reduction in death and injuries is to be accomplished "by specifying vehicle crashworthiness requirements in terms of forces and accelerations . . . ." 49 C.F.R. 571.208 S2.

Imposition of tort liability under Plaintiff's theory does not interfere with Congress' chosen method because it does not establish any performance standard. Standard 208 sets out minimum safety standards that are uniformly applicable to all cars manufactured, whereas tort liability operates to encourage behavior but not require it. Manufacturers may weigh the risks and benefits and choose to live with the occasional lawsuit rather than change their behavior. *See Wood,* 865 F.2d at 424 (Seyla, J., dissenting).

### CONCLUSION

Any preemptive effect of 15 U.S.C. § 1392(d) is limited to those state crashworthiness standards applicable to a particular aspect of vehicle or vehicle equipment performance, in terms of forces and accelerations, measured on anthropomorphic dummies in test crashes, when there is a federal standard already applicable to that same aspect of performance. Congress did not intend to occupy the entire field of performance standards. Arizona has recognized no common-law principle and has promulgated no regulatory law in actual conflict with federal law; thus, if Volkswagen is found liable in tort under the theory claimed by Plaintiff, there will be no conflict with federal law. It was possible for Volkswagen to both comply with federal law and be found liable in tort under Plaintiff's theory. Therefore, a finding of liability under state law would not interfere with or obstruct Congress' chosen methods of accomplishing the objectives set by the Safety Act.

Accordingly, we find there is neither express nor implied preemption of Plaintiff's claim. As one court aptly noted:

> [I]t remains to be seen whether a jury [will find the manufacturer] acted unreasonably, notwithstanding its alleged compliance with [Standard 208.] [T]he issue before this court at this time is whether the plaintiff has the right to ask the jury to decide.

*Tebbetts,* 665 A.2d at 347, citing RESTATEMENT (SECOND) OF TORTS § 288C (1965) ("Compliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions."); W. KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS 233 (5th ed. 1984) ("While compliance with a statutory standard is evidence of due care, it is not conclusive on the issue.").

Finding no preemption, we vacate the trial judge's order granting partial summary judgment and remand to the trial court for proceedings consistent with this opinion.

ZLAKET, V.C.J., and MOELLER and CORCORAN (retired), JJ.

MARTONE, Justice, concurring in the judgment.

I agree there is no preemption here, but not for the narrow reasons upon which the majority bases its decision. I do not believe that *Freightliner v. Myrick,* —— U.S. ——, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995), requires us to engage in an implied preemption analysis at all. I would decide this case on an issue left open in *Myrick.*

The majority concludes that there is no preemption because (1) this was not a frontal crash, and (2) Volkswagen chose an option that only mentioned frontal crash protection. It states § 1392(d) preempts "state crashworthiness standards applicable to a particular aspect of ... vehicle equipment performance ... when there is a federal standard already applicable to that *same* aspect of performance." *Ante,* at 248 (emphasis added). It then finds no preemption because the federal safety standard alleged to preempt plaintiff's claim, Standard 208, S4.1.2.2(b) ("Second Option"), "does not address the performance aspect at issue: ... rollover protection in the present case." *Id.* at 243.

But if rollover protection does not apply in this case, it is because the safety option Volkswagen chose—S4.1.2.2(b) (Second Option)—only mentions frontal crash protection. Under Standard 208, S4.1.2.1(c)(1), manufacturers who choose the "First Option" may have to satisfy "the rollover crash protection requirements of S5.3." Thus, the majority's preemption analysis hinges upon two fortuitous events: (1) the safety option chosen by the manufacturer, and (2) the type of accident. If the option chosen by the manufacturer addresses the safety requirements for the type of accident that caused the plaintiff's injuries, preemption exists. The majority acknowledges this when it says that the plaintiff in theory is preempted from suing on a state common law tort claim, "which alleges that a defective design failed to protect occupants in front-end accidents." *Ante,* at 246.

The majority creates a huge range of preemption and a narrow area of non-preemption. For example, had this been a front-end collision, there would have been preemption. Or had Volkswagen chosen the "First Option," there might have been preemption even as to this rollover incident. I simply do not believe that the Congress ever intended preemption to depend upon such relatively trivial factual distinctions.

I believe that nothing in *Myrick* changes the substance of our original opinion. The Supreme Court asked us to reconsider things in light of *Myrick,* but the only effect *Myrick* has on our opinion is its statement that "*Ci-*

*pollone* supports an inference that an express pre-emption clause forecloses implied pre-emption; it does not establish a rule." —— U.S. at ——, 115 S.Ct. at 1488. Therefore, *Myrick* would require us to reach an implied preemption analysis, "[e]ven if § 1392(d) does not expressly extinguish state tort law." *Id.* at ——, 115 S.Ct. at 1487. If that is all there were to *Myrick,* and the case before us, I would agree with the majority. But *Myrick* did not deal with § 1397(k), the savings clause. The Court characterized § 1392(d) as the express preemption clause and § 1397(k) as the savings clause. *Id.* at ——, 115 S.Ct. at 1486. In its dealing with express and implied preemption, the Court looked only to § 1392(d) and not to § 1397(k). The Court said "[w]e also need not address respondents' claim that the savings clause, § 1397(k), does not permit a manufacturer to use a federal safety standard to immunize itself from state common-law liability." *Id.* at —— n. 3, 115 S.Ct. at 1487 n. 3.

*Myrick* simply stands for the proposition that even where an express preemption clause does not extinguish state tort law, one must nevertheless engage in implied preemption analysis. It does not address whether one must engage in implied preemption analysis where there is a savings clause that expressly addresses the issue. The Court also did not have to reach the argument that the term "standard" in 15 U.S.C. § 1392(d) preempts only state statutes and not the common law. *Id.*

I would now reach these issues. I conclude, as we did in our original opinion, that standards mean standards and not the common law. I also conclude that the savings clause was calculated to prevent any argument to the contrary. I apply *Myrick* as follows. If you comply with federal safety standards, you may sell your cars in America. That is a necessary condition for the sale of cars in America. No state can interfere with that. But satisfaction of federal standards to sell cars in America is just that. It does not immunize one from state tort liability. Congress could not have chosen words more calculated to express its intent that compliance with standards does *not*

preempt state tort liability than the words it chose in § 1397(k). ("Compliance with any Federal motor vehicle standard ... does not exempt any person from any liability under common law.").

If we only had the express preemption clause, § 1392(d), I would agree with the majority that *Myrick* would require an implied preemption analysis. But here we have more. We have a savings clause which obviates the need for any narrow implied preemption analysis. "The text's the thing." *Bank One Chicago v. Midwest Bank & Tr. Co.,* —— U.S. ——, ——, 116 S.Ct. 637, 646, 133 L.Ed.2d 635 (1996) (Scalia, J., concurring).